[Crim. No. 13857. In Bank. Sept. 3, 1970.]

In re SIMEON ANTAZO on Habeas Corpus.

## COUNSEL

Sheldon Portman, Public Defender, for Petitioner.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and John T. Murphy, Deputy Attorney General, for Respondent.

## OPINION

**SULLIVAN, Acting C. J.** — We are confronted here with the question whether a convicted indigent defendant upon being sentenced or otherwise ordered to pay a fine and a penalty assessment can be required to serve them out in jail at a specified rate per day because he is unable to pay them. As we explain *infra,* such a defendant has no choice at all and in reality is being imprisoned for his poverty. ▮ Although a direction for confinement for default in payment of a fine may appear to apply equally to both the rich offender and the poor one, actually the former has the

opportunity to escape his confinement while the right of the latter to pay what he cannot, is a hollow one. We cannot countenance such a difference in treatment and, absent any compelling state interest necessitating it, we conclude that it constitutes an invidious discrimination on the basis of wealth in violation of the equal protection clause of the Fourteenth Amendment. We will not permit this petitioner to be given such a Hobson's choice.

Simeon Munsell Antazo, petitioner herein, was confined in the Santa Clara County jail at the Elmwood Rehabilitation Center in Milpitas pursuant to a superior court probation order requiring him to pay, as a condition of probation, a fine in the amount of $2,500 plus a penalty assessment in the amount of $625, or, in lieu of payment thereof to be imprisoned in the county jail one day for each $10 of the unpaid amount. Petitioner seeks a writ of habeas corpus on the ground that Penal Code sections 1205[1] and 13521,[2] which authorize the imposition of a fine (§ 1205) and the

---

[1]Section 1205 of the Penal Code provides in pertinent part:

"A judgment that the defendant pay a fine, with or without other punishment, may also direct that he be imprisoned until the fine is satisfied and may further direct that such imprisonment begin at and continue after the expiration of any imprisonment imposed as a part of the punishment or of any other imprisonment to which he may theretofore have been sentenced. Every such judgment must specify the extent of the imprisonment for nonpayment of the fine, which must not be more than one day for each five dollars ($5) of the fine, nor exceed in any case the term for which the defendant might be sentenced to imprisonment for the offense of which he has been convicted. A defendant held in custody for nonpayment of a fine shall be entitled to credit on the fine for each day he is so held in custody, at the rate specified in the judgment. When the defendant has been convicted of a misdemeanor, a judgment that the defendant pay a fine may also direct that he pay the fine within a limited time or in installments on specified dates and that in default of payment as therein stipulated he be imprisoned in the discretion of the court either until the defaulted installment is satisfied or until the fine is satisfied in full; but unless such direction is given in the judgment, the fine shall be payable forthwith.

"Except as otherwise provided in case of fines imposed as conditions of probation, the defendant must pay the fine to the clerk of the court, or to the judge thereof if there is no clerk, unless the defendant is taken into custody for nonpayment of the fine, in which event payments made while he is in custody shall be made to the officer who holds him in custody and all amounts so paid shall be forthwith paid over by such officer to the court which rendered the judgment. The clerk shall report to the court every default in payment of a fine or any part thereof, or if there is no clerk, the court shall take notice of such default. If time has been given for payment of a fine or it has been made payable in installments, the court shall, upon any default in payment immediately order the arrest of the defendant and order him to show cause why he should not be imprisoned until the fine or installment thereof, as the case may be, is satisfied in full. If the fine, or installment, is payable forthwith and it is not so paid, the court shall without further proceedings, immediately commit the defendant to the custody of the proper officer to be held in custody until the fine or installment thereof, as the case may be, is satisfied in full. The provisions of this section shall apply to any violation of any of the codes or statutes of the State of California punishable by a fine or by a fine and imprisonment."

[2]Section 13521 provides in pertinent part: "On and after the effective date of this section, there shall be levied a penalty assessment in an amount equal to five dollars

levy of a penalty assessment (§ 13521) as well as imprisonment pending payment thereof (§ 1205) are unconstitutional as applied to him. He contends in his petition that his imprisonment pursuant to these statutes as a result of his inability, due solely to his indigency, to pay his fine and penalty assessment constitutes an invidious discrimination based on poverty in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. We issued an order to show cause and ordered petitioner released upon his own recognizance pending final determination of this matter.

We first set forth the pertinent facts. On November 30, 1968, in the early hours of the morning, a fire broke out at the San Jose Speed and Marine Shop. Investigating officers of the San Jose Police Department discovered that the rear door was unlocked, that all windows were intact, and that the burglar alarm had not sounded. Steven Clausman, one of the owners, informed the police that certain inventory items and $320 in currency were missing from the shop. Arson investigators later determined that flammable liquid had been used to set five separate fires inside the establishment.

The Salinas Police Department later received information that petitioner was in possession of the missing speed equipment. They contacted petitioner and he voluntarily surrendered. After being advised of his constitutional rights, petitioner freely gave a statement to the Salinas police and to arson investigators from San Jose. In this statement petitioner admitted that he had conspired with Clausman to set fire to the shop, that he was to remove some of the inventory and retain it until Clausman had received settlement for his losses, and that he was to receive $1,000 for his part in the affair. Petitioner was booked at the Santa Clara County jail on a charge of arson and released on his own recognizance. Clausman was also arrested on the same charge.

On January 13, 1969, the Santa Clara County Grand Jury returned an indictment against petitioner and Clausman charging them with arson (§ 448a), arson of insured personal property (§ 450a), and conspiracy to commit said substantive offenses (§ 182, subd. 1). Petitioner was ar-

---

($5) for every twenty dollars ($20), or fraction thereof, of every fine, penalty, and forfeiture imposed and collected by the courts for criminal offenses, . . . It shall then be transmitted to the State Treasury to be deposited in the Peace Officer's Training Fund. . . ."

"In any case where a person convicted of any offense to which this section applies is imprisoned until the fine is satisfied, the judge may waive all or any part of the penalty assessment the payment of which would work a hardship on the person convicted or his immediate family."

Hereafter, unless otherwise indicated, all section references are to the Penal Code.

raigned and again released upon his own recognizance. Both defendants entered pleas of not guilty and the cause was set for trial.

Petitioner subsequently withdrew his plea of not guilty and entered a plea of guilty to the arson count. The court dismissed the other two counts and referred the matter to the probation officer for investigation and report. Petitioner remained at large on his own recognizance. In the meantime he testified as a witness for the prosecution at Clausman's trial. A jury convicted Clausman on all three counts.

On April 15, 1969, Clausman and petitioner were arraigned for judgment. After considering the probation reports of both men, the trial judge stated that he considered both defendants "as standing in the same and identical shoes before the Court with respect to responsibility for these matters." The court then ordered that imposition of sentence on each defendant be suspended for a period of three years, and that each defendant be released upon probation on the condition, among others, that each pay a fine of $2,500 plus a penalty assessment of $625 "or in lieu of payment thereof one (1) day in the County Jail for each $10.00 unpaid."

The deputy public defender informed the court that petitioner because of his financial condition would probably have to serve out his fine, and requested the court to waive the *penalty assessment*. The judge denied the request, stating that he did not believe that petitioner could be imprisoned for nonpayment of the assessment. Clausman paid his fine and assessment, and was released on the following morning; petitioner, lacking funds with which to make payment, began serving his sentence forthwith at the rate specified in the probation order. On July 24, the deputy public defender again requested the trial judge to waive the penalty assessment; the request was again denied.

Petitioner complains that his imprisonment is illegal in that he has been deprived of his liberty solely because of his indigency while his codefendant, possessed of funds with which to pay both the fine and assessment, has been released.

Respondent[3] asserts in his return that habeas corpus is unavailable to petitioner and that in any event the above-mentioned condition of probation ordering petitioner's imprisonment[4] for nonpayment of fine (a) "is without constitutional infirmity" and (b) is a reasonable one relating to petitioner's reformation and rehabilitation. In his traverse to the return

---

[3]Respondent is *Charles J. Prelsnik*, the Sheriff of Santa Clara County, although the return to the order to show cause appears to have been by both the respondent and the People. Hereafter we shall refer to respondent in the singular.

[4]We will use the language of the statute (§ 1205) although petitioner was confined in the county jail.

petitioner broadens his attack on the probation order, contending that its conditions were unreasonable since they violated his "constitutional rights to due process, equal protection and against excessive fines as provided in the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States, and Article 1, Sections 6 and 13 of the Constitution of the State of California." We first consider the availability of the relief sought.

The gist of respondent's argument is as follows: An appeal lies from an order granting probation following conviction (citing § 1237, subd. 3, as it read prior to the 1968 revision); petitioner did not appeal; as a general rule, habeas corpus cannot serve as a substitute for an appeal (citing *In re Dixon* (1953) 41 Cal.2d 756, 759 [264 P.2d 513]); and petitioner has urged no special circumstances to warrant an exception to such rule.

We confronted such an argument in *In re Black* (1967) 66 Cal.2d 881 [59 Cal.Rptr. 429, 428 P.2d 293] where we had this to say: "We referred to such restrictions on the use of the writ in *In re Dixon* (1953) 41 Cal.2d 756, 759 [264 P.2d 513]: 'The general rule is that habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction. [Citations.]' (In accord: *In re Shipp* (1965) 62 Cal.2d 547, 551-552 [43 Cal.Rptr. 3, 399 P.2d 571]; *In re Manchester* (1949) 33 Cal.2d 740, 742 [204 P.2d 881]; *In re Connor* (1940) 16 Cal.2d 701, 705 [108 P.2d 10].) But we made clear in *Dixon* and in other cases that although a remedy by appeal or other direct attack might have been available, the writ of habeas corpus nevertheless will lie where special circumstances are presented. (*In re Newbern* (1960) 53 Cal.2d 786, 789-790 [3 Cal.Rptr. 364, 350 P.2d 116]; *In re Osslo* (1958) 51 Cal.2d 371, 376-377 [334 P.2d 1]; *In re Bine* (1957) 47 Cal.2d 814, 817-818 [306 P.2d 445]; *In re Dixon, supra, In re Seeley* (1946) 29 Cal.2d 294, 296 [176 P.2d 24]. It has been said that the 'requirement of exhaustion of the appellate or other remedy . . . is merely a discretionary policy governing the exercise of the reviewing court's jurisdiction to issue the writ.' (Witkin, Cal. Criminal Procedure (1963) p. 769; see *In re Bell* (1942) 19 Cal.2d 488, 495 [122 P.2d 22].)" (*Id.* at pp. 886-887.)

In the instant case petitioner bases his petition for a writ of habeas corpus upon a constitutional question of great magnitude—that he has been deprived of his liberty in violation of rights secured to him by the equal protection clause. This court has held that the presence of a constitutional question of extraordinary importance constitutes special circumstances sufficient to relieve a petitioner from the operation of the above-mentioned

general rule. (*In re Allen* (1969) 71 Cal.2d 388, 389 [78 Cal.Rptr. 207, 455 P.2d 143]; *In re Bell* (1942) 19 Cal.2d 488, 495 [122 P.2d 22]. See also *In re Oxidean* (1961) 195 Cal.App.2d 814, 817 [16 Cal.Rptr. 193]; Witkin, Cal. Criminal Procedure, § 797, *supra,* at p. 770.) Thus, as we said in *In re Bell, supra,* 19 Cal.2d 488, 495, "While a few courts require that all available remedies by appeal be exhausted before habeas corpus can be invoked to test constitutionality [citation], most jurisdictions, including California, do not make the requirement mandatory. . . ." In view of the foregoing we conclude that petitioner has demonstrated that the instant case presents special circumstances within the above-mentioned rule. Accordingly his failure to appeal from the probation order does not preclude our consideration of the constitutional question presented by the facts of this case.

We, therefore, take up petitioner's main contention that his imprisonment solely because of his financial inability to pay the fine imposed on him as a condition of probation offends the equal protection clause of the Fourteenth Amendment. The essence of this claim is that, while ostensibly applying to both the rich and the poor, actually a sentence to pay a fine, together with a direction that a defendant be imprisoned until the fine is satisfied, gives an advantage to the rich defendant which is in reality denied to the poor one. "The 'choice' of paying $100 fine or spending 30 days in jail is really no choice at all to the person who cannot raise $100. The resulting imprisonment is no more or no less than imprisonment for being poor, . . ." (Remarks of former Associate Justice Goldberg in Goldberg, *Equality and Governmental Action* (1964) 39 N.Y.U.L.Rev. 205, 221.) To put it in another way and in the context of the present case, when a fine in the same amount is imposed upon codefendants deemed equally culpable with the added provision for their imprisonment in the event of its nonpayment, an option is given to the rich defendant but denied to the poor one. While the poor man has the "right" to obtain his release by payment of the fine, in actuality the "right" is meaningless to him. It is this difference in the final treatment of each which petitioner attacks.[5]

We make two preliminary observations. First, we are aware that the practice of ordering imprisonment for nonpayment of fines has been long and well established in Anglo-American law and has prevailed for some time in the courts of most of our states. (*Williams* v. *Illinois* (1970) 399 U.S. 235 [26 L.Ed.2d 586, 90 S.Ct. 2018]; Note, *Fines, Im-*

---

[5]We do not consider petitioner's further complaint, "In addition to ignoring petitioner's lack of financial resources, the court below also gave no consideration whatever to his prompt surrender and admission of guilt . . . , nor to his willing cooperation throughout the continued investigation of the case, nor to his assistance to the district attorney in testifying [against Clausman]."

*prisonment, and the Poor: "Thirty Dollars or Thirty Days"* (1969) 57 Cal.L.Rev. 778, 780-787.) Nevertheless, while a factor to be considered, the long-standing recognition of this practice does not foreclose its reassessment in the light of the continued evolution of fundamental precepts of our constitutional system, for "neither the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack, . . ." (*Williams* v. *Illinois, supra,* 399 U.S. 235, 239 [26 L.Ed.2d 586, 592].) An abiding concern for equality in all areas of tcday's society has not spared established practices from exposure under the spotlight of equal protection principles. (See, e.g., Sager, *Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indigent* (1969) 21 Stan.L.Rev. 767, 774-780; Note, *Developments in the Law—Equal Protection* (1969) 82 Harv.L.Rev. 1065, 1067.)

Second, we note that the factual predicate underlying petitioner's contention in the case at bench is unquestionably true. Respondent does not dispute,[6] nor could he, that application of the California statutes here involved necessarily results in different treatment for the rich defendant and for the poor one. "The nature of the penalty *actually inflicted* by a sentence of '$25.00 or 10 days' depends on the defendant's financial ability and personal choice. If he chooses, *and is able,* to pay the fine, he can avoid imprisonment. If he chooses imprisonment, he can avoid the fine. If he cannot pay the fine, he cannot avoid imprisonment." (Italics added.) (*Wildeblood* v. *United States* (1960) 284 F.2d 592, 593 [109 App.D.C. 163, 164], dissenting opinion of Edgerton, J.) The fact that this difference in treatment may be unintended and results from the application of a statute which is fair on its face, does not preclude an attack on equal protection grounds upon the statute as applied. (*Griffin* v. *Illinois* (1956) 351 U.S. 12 [100 L.Ed. 891, 76 S.Ct. 585]; *Strattman* v. *Studt* (1969) 20 Ohio St.2d 95 [253 N.E.2d 749, 751-752].) We first set forth the standards by which such an attack can be evaluated.

We begin with the fundamental principle of *Griffin* that justice must be administered to all persons equally. In that case it was held that the state's failure to provide indigent defendants in a criminal case with a transcript of the trial proceedings at public expense so that they could obtain adequate appellate review constituted an invidious discrimination in violation of the equal protection clause of the Fourteenth Amendment. The high court declared: "In criminal trials a State can no more discriminate on account of poverty than on account of religion, race, or color. . . . Such a denial [of a free transcript] is a misfit in a country dedicated to affording equal justice to all and special privileges to none in the administration of its criminal

---

[6]As noted above respondent's contentions go solely to the question of whether the discrimination of which petitioner complains is justified.

law. [Fn. omitted.] There can be no equal justice where the kind of trial a man gets depends on the amount of money he has." (*Griffin* v. *Illinois, supra,* 351 U.S. at pp. 17-19 [100 L.Ed. at pp. 898-899], passim.) Decisions following *Griffin*[7] have consistently reaffirmed this fundamental principle of equal justice.

■ However the equal protection clause does not require "Absolute equality" (*Douglas* v. *California, supra,* 372 U.S. 353, 357 [9 L.Ed.2d 811, 814, 83 S.Ct. 814]), is not "a demand that a statute necessarily apply equally to all persons" (*Rinaldi* v. *Yeager* (1966) 384 U.S. 305, 309 [16 L.Ed.2d 577, 580, 86 S.Ct. 1497]) and permits a state to "provide for differences so long as the result does not amount to . . . an 'invidious discrimination.' " (*Douglas* v. *California, supra,* at p. 356 [9 L.Ed.2d at p. 814].) ■ Simply stated the "concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." (*Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645].)

The traditional test has been that the "distinction drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal." (*McDonald* v. *Board of Election Comrs.* (1969) 394 U.S. 802, 809 [22 L.Ed.2d 739, 745-746, 89 S.Ct. 1404].) But a stricter standard has been prescribed in cases involving "suspect classifications" or "fundamental interests." (*Purdy & Fitzpatrick* v. *State of California, supra,* 71 Cal.2d at pp. 578-579.) In *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487], we recently had occasion to epitomize the standards to be applied in evaluating classifications under the equal protection clause: "As this court has previously noted, [fn. omitted] the United States Supreme Court has tended to employ a two-level test in reviewing legislative classifications under the equal protection clause. In the area of economic regulation, the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn

[7]See, for example, *Eskridge* v. *Washington Prison Board* (1958) 357 U.S. 214, 216 [2 L.Ed.2d 1269, 1271, 78 S.Ct. 1061]; *Burns* v. *Ohio* (1959) 360 U.S. 252, 257-258 [3 L.Ed.2d 1209, 1212-1213, 79 S.Ct. 1164]; *Smith* v. *Bennett* (1961) 365 U.S. 708, 709, 713-714 [6 L.Ed.2d 39, 40, 43-44, 81 S.Ct. 895]; *Douglas* v. *California* (1963) 372 U.S. 353, 355-356, 357-358 [9 L.Ed.2d 811, 813-815, 83 S.Ct. 814]; *Lane* v. *Brown* (1963) 372 U.S. 477, 483-485 [9 L.Ed.2d 892, 896-898, 83 S.Ct. 768]; *Draper* v. *Washington* (1963) 372 U.S. 487, 499-500 [9 L.Ed.2d 899, 907-908, 83 S.Ct. 774]; *Long* v. *District Court of Iowa* (1966) 385 U.S. 192, 194-195 [17 L.Ed.2d 290, 292-293, 87 S.Ct. 362]; *Anders* v. *California* (1967) 386 U.S. 738, 741, 745 [18 L.Ed.2d 493, 496, 498, 87 S.Ct. 1396]; *Entsminger* v. *Iowa* (1967) 386 U.S. 748, 751 [18 L.Ed.2d 501, 503-504, 87 S.Ct. 1402]; *Roberts* v. *LaVallee* (1967) 389 U.S. 40, 42 [19 L.Ed.2d 41, 43, 88 S.Ct. 194]; *Williams* v. *Illinois, supra,* 399 U.S. 235, 239 [26 L.Ed.2d 586, 591, 90 S.Ct. 2018].

by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. (See *McDonald* v. *Board of Election Comrs.* (1969) 394 U.S. 802, 809 [22 L.Ed.2d 739, 745-746, 89 S.Ct. 1404]; *McGowan* v. *Maryland* (1961) 366 U.S. 420, 425-426 [6 L.Ed.2d 393, 398-399, 81 S.Ct. 1101].) [Par.] On the other hand, in cases involving 'suspect classifications' or touching on 'fundamental interests,' [fns. omitted] the court has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. (See *Shapiro* v. *Thompson, supra,* 394 U.S. 618, 638 [22 L.Ed.2d 600, 617, 89 S.Ct. 1322]; *Sherbert* v. *Verner* (1963) 374 U.S. 398, 406 [10 L.Ed.2d 965, 971-972, 83 S.Ct. 1790]; *Skinner* v. *Oklahoma, supra,* 316 U.S. 535, 541 [86 L.Ed. 1655, 1660, 62 S.Ct. 1110]; see also *Developments in the Law—Equal Protection* (1969) 82 Harv.L.Rev. 1064, 1120-1131.) Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." (See *Castro* v. *State of California* (1970) 2 Cal.3d 223, 234-236 [85 Cal.Rptr. 20, 466 P.2d 244].)

More recently in *Williams* v. *Illinois, supra,* 399 U.S. 235 [26 L.Ed.2d 586], the Supreme Court dealt with the equal protection clause in a factual setting very similar to the one now before us. There the defendant, an indigent, was convicted of petty theft and was given the maximum sentence provided by law—one year imprisonment and a $500 fine; he was also taxed $5 in court costs. As permitted by the Illinois statute, the judgment directed that in the event of nonpayment of the fine and costs, the defendant was to remain in jail to "work off" such obligations at the rate of $5 per day. The effect of this was to extend his incarceration for 101 days beyond the maximum period of confinement.

Vacating the judgment and remanding the case for further proceedings, the court said: "Applying the teaching of the *Griffin* case here, we conclude that an indigent criminal defendant may not be imprisoned in default of payment of a fine beyond the maximum authorized by the statute regulating the substantive offense. [Par.] . . . Here the Illinois statute as applied to Williams works an invidious discrimination solely because he is unable to pay the fine. On its face the statute extends to all defendants an apparently equal opportunity for limiting confinement to the statutory maximum simply by satisfying a money judgment. In fact, this is an illusory choice for Williams or any indigent who, by definition, is without funds. [Fn. omitted.] Since only a convicted person with access to funds can avoid the increased imprisonment the Illinois statute in operative effect exposes only indigents to the risk of imprisonment beyond the statutory maximum. By making the maximum confinement contingent upon one's ability to pay, the State has

visited different consequences on two categories of persons since the result is to make incarceration in excess of the statutory maximum applicable only to those without the requisite resources to satisfy the money portion of the judgment. [Fn. omitted.]"[8] (*Williams* v. *Illinois, supra,* 399 U.S. 235, 241, 242 [26 L.Ed.2d 586, 593, 594].)

We are satisfied that in the case at bench, as in *Williams,*[9] we are presented with an example of discrimination between different groups or classifications of convicted criminal defendants—those who are poor and those who are not—or, to put it another way, of discrimination based upon poverty. We have no doubt therefore that the instant case involves "suspect classifications" which must be reviewed and evaluated under the stricter standards mentioned above. We therefore reject respondent's contention that the statutes in question as here applied are "without constitutional infirmity" in the light of the equal protection clause. Our inquiry then is whether imprisonment of an indigent convicted defendant for nonpayment of a fine is "necessary to promote a *compelling* governmental interest, . . ." (*Shapiro* v. *Thompson, supra,* 394 U.S. 618, 634 [22 L.Ed.2d 600, 615].)

As we have already pointed out, respondent contends that petitioner's imprisonment can be justified because (a) it "acts as a method" of enforcing payment of the fine and (b) it "relates to" his reformation and rehabilitation. Somewhat in the manner of the court in *Williams,* we assume that the state's interest in the collection of fines and in the reformation and rehabilitation of convicted defendants is "substantial and legitimate." (*Williams* v. *Illinois, supra,* 399 U.S. 235, 238 [26 L.Ed.2d 586, 591].) The crucial question before us is whether the practice of imprisoning indigent convicted defendants for nonpayment of fines is necessary to promote either of these interests.

A number of cases have considered the constitutional validity of the

[8]The *Williams* court appears to have assumed that the state's interest in the collection of revenues produced by payment of fines is "substantial and legitimate." (399 U.S. 235, 238 [26 L.Ed.2d 586, 591].) By extending the rationale of *Griffin* to a de facto discrimination not affecting the integrity of trial or appellate processes (cf. *Rinaldi* v. *Yeager, supra,* 384 U.S. 305, 307-308 [16 L.Ed.2d 577, 579]), the court also appears to have concluded that the discrimination inherent in the type of sentence invoked in *Williams* is not necessary to promote such "substantial and legitimate" interest. By pointing to the existence of alternative, less intrusive methods of promoting this interest, the court in effect demonstrated the lack of necessity. (399 U.S. at p. 244 [26 L.Ed.2d at p. 595].)

[9]*Williams* involved slightly different facts. There the trial court imposed the maximum sentence: one year imprisonment and a $500 fine. Of necessity, inability to pay the fine portion of the sentence resulted in longer imprisonment than could be imposed in the case of a defendant with means. (Cf. *People* v. *Saffore* (1966) 18 N.Y.2d 101 [271 N.Y.S.2d 972, 218 N.E.2d 686].) Imprisonment for nonpayment of the fine in the instant case does not, of course, result in a total term of imprisonment in excess of the statutory maximum. (Pen. Code, § 448a.)

practice in question.[10] Virtually none of these decisions, however, have analyzed the problem in terms of the relationship between imprisonment of indigents and the state interests sought to be promoted thereby.[11] Accordingly, it would serve no worthwhile purpose to review the varying results reached in these decisions or the conflicting rationales employed.[12]

■ We first consider whether the practice is necessary to promote the state's interest in collection of fines. There are two reasons why it is not.

In the first place, it is not clear that imprisonment can serve the end of

[10]Prior to 1960 none of the cases appear to have involved challenges based upon a defendant's indigency. See, e.g., *Hill* v. *Wampler* (1936) 298 U.S. 460 [80 L.Ed. 1283, 56 S.Ct. 760]; *Ex parte Jackson* (1877) 96 U.S. 727 [24 L.Ed. 877]; *Ex parte Garrison* (1924) 193 Cal. 37, 38 [223 P. 64]; *In re Claudette* (1937) 21 Cal.App.2d 688 [69 P.2d 1021]; *In re Sullivan* (1906) 3 Cal.App. 193, 194-195 [84 P. 781]; *People* ex rel. *Gately* v. *Sage* (1897) 13 App.Div. 135 [43 N.Y.S. 372, 373-374]; but cf. *Foertsch* v. *Jameson* (1925) 48 S.D. 328 [204 N.W. 175, 176]. The question whether the imprisonment of indigent convicted defendants for nonpayment of fines offended the equal protection clause under the principle declared in *Griffin* was raised in *Wildeblood* v. *United States, supra,* 284 F.2d 592 [109 App.D.C. 163] (dissent by Edgerton, J.). During the last 10 years numerous cases dealt with the question. See, for example, *United States* ex rel. *Privitera* v. *Kross* (S.D.N.Y. 1965) 239 F.Supp. 118, affd. (2d Cir. 1965) 345 F.2d 533, cert. denied (1965) 382 U.S. 911 [15 L.Ed.2d 163, 86 S.Ct. 254]; *Kelly* v. *Schoonfield* (D.Md. 1968) 285 F.Supp. 732; *Morris* v. *Schoonfield* (D.Md. 1969) 301 F.Supp. 158, vacated 399 U.S. 508 [26 L.Ed.2d 773, 90 S.Ct. 2232]; *Sawyer* v. *District of Columbia* (D.C.App. 1968) 238 A.2d 314; *People* v. *Williams* (1969) 41 Ill.2d 511 [244 N.E.2d 197] revd. *sub nom. Williams* v. *Illinois, supra,* 399 U.S. 235 [26 L.Ed.2d 586, 90 S.Ct. 2018]; *People* ex rel. *Jackson* v. *Ruddell* (1969) 42 Ill.2d 40 [245 N.E.2d 761]; *State* v. *Hampton* (Miss. 1968) 209 So.2d 899; *Wade* v. *Carsley* (Miss. 1969) 221 So.2d 725; *State* v. *Lavelle* (1969) 54 N.J. 315 [255 A.2d 223]; *State* v. *Allen* (1969) 104 N.J. Super. 187 [249 A.2d 70], affd. 54 N.J. 311 [255 A.2d 221]; *People* v. *Saffore, supra,* 18 N.Y.2d 101 [271 N.Y.S.2d 972, 218 N.E.2d 686]; *People* v. *Mackey* (1966) 18 N.Y.2d 755 [274 N.Y.S.2d 682, 221 N.E.2d 462]; *People* v. *Tennyson* (1967) 19 N.Y.2d 573 [281 N.Y.S.2d 76, 227 N.E.2d 876]; *People* v. *Collins* (1965) 47 Misc.2d 210 [261 N.Y.S.2d 970]; *People* ex rel. *Loos* v. *Redman* (1965) 48 Misc.2d 592 [265 N.Y.S.2d 453]; *People* v. *McMillan* (1967) 53 Misc.2d 685 [279 N.Y.S.2d 941]; *Nemeth* v. *Thomas* (N.Y. Sup.Ct., Dec. 5, 1966) 35 U.S.L. Week 2320; *Strattman* v. *Studt, supra,* 20 Ohio St.2d 95 [253 N.E.2d 749]; *Petition of Cole* (1968) 17 Ohio App.2d 207 [245 N.E.2d 384]; *Ex parte Tate* (Tex.Crim.App. 1969) 445 S.W.2d 210, cert. granted June 29, 1970, *sub nom. Tate* v. *Short,* 399 U.S. 925 [26 L.Ed.2d 792, 90 S.Ct. 2257]. See generally Annot., 31 A.L.R.3d 926.

[11]The opinion in *Strattman* v. *Studt, supra,* 20 Ohio St.2d 95 [253 N.E.2d 749] constitutes one of the few examples of such analysis coming to our attention.

[12]The decisions upholding the validity of the practice have often been accompanied by vigorous dissents. See, e.g., *State* v. *Allen, supra,* 104 N.J. Super. 187 [249 A.2d 70, 75] (Conford, J., dissenting); *State* v. *Lavelle, supra,* 54 N.J. 315, 328 [255 A.2d 223, 230] (Proctor, J. dissenting, concurred in by Jacobs and Schettino, JJ.); *Morris* v. *Schoonfield, supra,* 301 F.Supp. 158, 165 (Winter, J. concurring in part and dissenting in part).

enforcing collection of the fine at all in the instant case. We have no doubt that this practice may properly be used to compel payment of fines in proper cases. (*Ex parte Garrison, supra,* 193 Cal. 37, 38 and cases there cited; *In re Fil Ki* (1889) 80 Cal. 201, 203 [22 P. 146]; *Ex parte Kelly* (1865) 28 Cal. 414, 415. Proper use of imprisonment as a coercive mechanism presupposes an ability to pay and a contumacious offender. In the instant case we deal with the application of the practice to *indigents.* (See fn. 6, *ante.*) As applied to indigents we fail to see how either the threat or the actuality of imprisonment can force a man who is without funds, to pay a fine. (Accord: *Morris* v. *Schoonfield, supra,* 301 F.Supp. 158, 163, vacated on other grounds (1970) 399 U.S. 508 [26 L.Ed.2d 773, 90 S.Ct. 2232]; Note, 4 Houston L.Rev. (1967) 695, 701.)

█ In the second place, even if it is assumed that imprisonment of indigents serves the state's purpose of enforcing collection of fines, it is clear that this particular mechanism for promoting that state interest is not "necessary" in the constitutional sense. In *Williams* the court held that the particular type of "work-out" sentence there involved was not necessary to promote the state's legitimate interest because there existed alternative and less-intrusive means whereby the state could further its interest. There Chief Justice Burger said: "The State is not powerless to enforce judgment against those financially unable to pay a fine; . . . [Par.] [there are] numerous alternatives to which the State by legislative enactment—or judges within the scope of their authority—may resort in order to avoid imprisoning an indigent beyond the statutory maximum for involuntary nonpayment of a fine. . . ." (399 U.S. at p. 244 [26 L.Ed.2d at p. 595].) The alternative procedures for collecting fines of which the court spoke in *Williams* are no less efficacious in the instant case than they were there.[13] Because the state has available to it these alternative methods of collecting fines, we cannot conclude that imprisonment of indigents is necessary to promote this state interest.

We turn to consider respondent's contention that imprisonment is permissible because it serves the state's interest in the rehabilitation and reformation of indigent offenders. We find it also untenable. Respondent's

---

[13]The court in *Williams* listed several alternatives to imprisonment for nonpayment of fines. (See *Williams* v. *Illinois, supra,* 399 U.S. at p. 244 [26 L.Ed.2d at p. 595].) A number of authorities in addition to these have also proposed means by which the state may promote its interests. (See Task Force on Administration of Justice, President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Courts (1967) at p. 18; Note, *Fines, Imprisonment and the Poor, supra,* 57 Cal.L.Rev. 778, 810-819; Comment, *Equal Protection and the Use of Fines as Penalties for Criminal Offenses* (1966) 1966 Ill.L.Forum 460, 463-466; Note, *The Equal Protection Clause and Imprisonment of the Indigent for Nonpayment of Fines* (1966) 64 Mich.L.Rev. 938, 945-947.)

position is that petitioner's imprisonment is valid because "the condition of a fine or a reparation, even though petitioner is unable to pay, impresses upon him his responsibility to the county for his criminal behavior. Awareness of the financial price of his conduct, a mere token of the total cost of the criminal prosecution, may encourage him to be a law-abiding citizen, to meet his responsibilities and to satisfy his obligations."

Although respondent does not explain how the imposition of a fine impresses such values upon an indigent, obviously his position must be that imprisonment for the indigent's involuntary failure to pay the fine is a related and equally effective means of doing so. It does not follow, however, that the mere equating of the imprisonment of the indigent who cannot pay a fine with the cash payment of the nonindigent who can, to the end of promoting the rehabilitation of both classes of offenders, compels the conclusion that the treatment of the former is constitutionally permissible. What we have said above establishes that there are alternative methods by which the state may enforce collection of fines. These same methods simultaneously promote the state's interest in rehabilitating the offender and by requiring compliance on the part of an indigent offender with onerous conditions, they serve to make him aware of his responsibility for his criminal conduct and to encourage him to become a law-abiding citizen.

■ In sum, the state can impress upon indigents their "responsibility to the county for [their] criminal behavior" through available alternate procedures. Since the state may thus promote its interest in rehabilitation directly, imprisonment of the indigent offender for nonpayment of his fine should not be necessary.

■ In the case before us, the record shows beyond any contradiction that although imposition of sentence was· suspended and petitioner was granted probation, he was unable to pay the fine and penalty assessment fixed by the court as a condition of probation, *solely* because he was an indigent. Under the court's order, he incurred imprisonment, not because he refused to comply with these conditions of his probation, but simply because he was unable to do so. Although the court had apparently determined that a proper punishment for his offense did not require incarceration, he was unable to obtain his freedom only because he was poor.

We therefore conclude that petitioner's imprisonment because of his inability, due solely to his indigency, to pay the fine and penalty assessment imposed upon him as a condition of probation was not necessary to promote the state interests claimed by respondent and constituted an invidious discrimination based on his poverty in violation of the equal protection clause of the Fourteenth Amendment. ■ We further conclude that

Penal Code sections 1205 and 13521 as applied to petitioner are unconstitutional. ■ As a result execution of the provisions of the probation order here under attack cannot be upheld on the independent bases urged by respondent that said provisions constitute a reasonable condition relating to petitioner's reformation and rehabilitation. Their inherent constitutional defect is fatal to their serving this function.

We deem it desirable to make the following observations. ■ First, there is no significant difference in the fact that petitioner's fine and penalty assessment were imposed as a condition of probation in the court's probation order rather than in a judgment of conviction after denial of probation. We are of the view that the same constitutional principles govern both situations.

Second, we do not hold that the imposition upon an indigent offender of a fine and penalty assessment, either as a sentence or as a condition of probation, constitutes of necessity in all instances a violation of the equal protection clause. Depending upon the circumstances of the particular case and the condition of the individual offender, there are a variety of ways in which the state may fine the indigent offender, as alternatives to imprisonment, without offending the command of equal protection (see fn. 13, *ante*). ■ What we say is that Penal Code sections 1205 and 1203.1 may not be applied in such a way as to foreclose to the indigent offender the opportunity to obtain his freedom which is implicit in a sentence or probation order providing for payment of a fine. Rather, our holding is simply that an indigent who would pay his fine if he could, must be given an option comparable to an offender who is not indigent. When the indigent offender refuses to avail himself of such alternatives at the inception, or defaults or otherwise fails to meet the conditions of the particular alternative which is offered him without a showing of reasonable excuse, the indigent offender becomes in the eyes of the court exactly the same as the contumacious offender who is not indigent. When either of these conditions obtain the offender's *indigency* ceases to be dispositive and he may, consistently with the mandate of the equal protection clause, be relegated to "working out" his fine by imprisonment.

Finally, we point out that nothing in today's opinion diminishes the wide scope of authority vested in the sentencing judge in the exercise of his powers. (See *Williams* v. *Illinois, supra,* 399 U.S. at p. 244 [26 L.Ed.2d at p. 595].) ■ Our holding requires only that an indigent be released when the sentencing judge has found his imprisonment to be unnecessary to serve any public interest (see *State* v. *Lavelle, supra,* 54 N.J. 315, 320 [255 A.2d 223, 226]); we assume that a fine is not imposed on a particular indigent offender with the objective of bringing about his eventual imprison-

ment for its nonpayment for "to do so would be to accomplish indirectly as to an indigent that which cannot be done directly." (*Williams* v. *Illinois, supra,* 399 U.S. at p. 243 [26 L.Ed.2d at p. 595]. See *Henderson* v. *United States* (Dist.Col.App. 1963) 189 A.2d 132, 133.) The sentencing judge's bona fide discretion to impose imprisonment directly in cases where he deems it appropriate is unaffected by today's decision.

In view of the conclusions which we have reached, it is unnecessary to discuss petitioner's remaining contentions.

We have decided that the petition for the writ of habeas corpus should be granted only to discharge petitioner from the illegal restraint depicted above, namely his imprisonment resulting from his inability, due to his indigency, to pay the fine and penalty assessment imposed as a condition of probation but not to discharge or relieve him from any other restraint or obligation to which he may be subject by virtue of the Order for Probation entered by the superior court on April 15, 1969. Since petitioner has been impermissibly confined in jail pursuant to the order that court is directed to allow him for the period of his confinement a credit against the amount of his fine and penalty assessment calculated at the rate specified in said Order for Probation and an adequate opportunity, consonant with the views herein expressed, to pay the balance.[14] Since that portion of paragraph 7 of the Order for Probation providing for confinement in jail in lieu of payment of the monetary obligations therein specified may be constitutionally carried out in some circumstances, we do not order it stricken, but we direct that execution of the order by the superior court be in accordance with the views herein expressed. Except as hereinabove stated the Order for Probation is not vacated, modified or affected by this opinion.

The writ is granted. Petitioner is discharged from the custody of the sheriff of Santa Clara County.

Peters, J., Tobriner, J., Mosk, J., Burke, J., and Molinari, J.,* concurred.

**McCOMB, J.**—I dissent. I would deny the writ.

---

[14]The record shows that petitioner was confined in the county jail between the dates of April 15 and October 17, 1969, or a total of 186 days. The condition set for probation was the payment for a fine of $2,500 and a 25 percent penalty assessment, or the sum of $3,125. At the rate specified in the probation order defendant has satisfied $1,860 of this sum. There is now outstanding a debt in the amount of the difference, $1,265, owing from petitioner to the County of Santa Clara.

*Assigned by the Chairman of the Judicial Council.