Filed 9/12/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B292031 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA106460) |
| v. | |
| AXEL EFREN CACERES, | |
| Defendant and Appellant. | |

     APPEAL from a judgment of the Superior Court of Los Angeles County, Laura L. Laesecke, Judge. Affirmed.

     Melissa J. Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

     Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Axel Caceres appeals from the judgment after his conviction for criminal threats against E.S.J., the mother of his daughter. Caceres contends his crime was not one "involving domestic violence" as required under Penal Code[1] section 136.2, subdivision (i)(1), and thus the trial court erred in issuing a protective order forbidding Caceres from contacting or approaching E.S.J. He further argues that, under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), the trial court violated his right to due process by imposing court assessments and a restitution fine without first ascertaining his ability to pay.

We conclude that Caceres's threats against his child's mother constitute domestic violence under Family Code section 6211, a statutory section expressly cross-referenced in section 136.2, subdivision (i)(1), and therefore the trial court properly issued the protective order. We further conclude that the due process analysis in *Dueñas* does not support its broad holding, and it is distinguishable on its facts from this case. Accordingly, we affirm the judgment.

## FACTUAL BACKGROUND

At the preliminary hearing, E.S.J. testified that she had dated Caceres for about seven years and they had a daughter together. One night around midnight, Caceres arrived at E.S.J.'s apartment and knocked at the door, yelling that if she did not open it he would kill her. E.S.J. told him she would call the police if he did not go away, and he said, " 'Go ahead and call them. By the time they get here, I will have chopped you up.' "

---

[1] Further unspecified statutory citations are to the Penal Code.

After about 10 minutes of yelling and knocking, Caceres left. As he was leaving, E.S.J. saw he was holding "the point of a knife" in his hand.

## PROCEDURAL BACKGROUND

An information charged Caceres with one count of criminal threats against E.S.J. (§ 422, subd. (a)), and one count of violating a domestic violence protective order with a prior conviction for violating a court order (§ 166, subd. (c)(4)). The information alleged that Caceres used a knife in committing the charged offenses (§ 12022, subd. (b)(1)).

Caceres pleaded no contest to the criminal threats charge, and the trial court found him guilty. Pursuant to plea negotiations, the trial court dismissed the count for violating a protective order.

For the criminal threats conviction, the trial court denied probation and sentenced Caceres to 16 months in state prison with 924 days of custody and conduct credits. The trial court imposed a $40 court operations assessment (§ 1465.8, subd. (a)(1)), a $30 criminal conviction assessment (Gov. Code, § 70373),[2] and a $300 restitution fine (§ 1202.4, subd. (b)). The trial court imposed and stayed a $300 parole revocation fine. Defendant was served in open court with a domestic violence criminal protective order pursuant to section 136.2, subdivision (i)(1), barring him from contacting or coming within 100 yards of E.S.J.

Caceres timely appealed.

_____

[2] The assessment under Government Code section 70373 is also referred to as a "court facilities assessment." (See, e.g., *Dueñas*, *supra*, 30 Cal.App.5th at p. 1162.)

## DISCUSSION

### A. The Trial Court Properly Issued The Protective Order

Caceres argues that the crime for which he was convicted, criminal threats, was not a "crime involving domestic violence," as required to subject him to a protective order under section 136.2, subdivision (i)(1). Caceres is incorrect.

As relevant here, section 136.2, subdivision (i)(1) provides that "[i]n all cases in which a criminal defendant has been convicted of a crime involving domestic violence as defined in [Penal Code] Section 13700 or in Section 6211 of the Family Code," the trial court, "at the time of sentencing, shall consider issuing an order restraining the defendant from any contact with a victim of the crime." Thus, section 136.2, subdivision (i)(1) applies to crimes involving domestic violence as defined under either section 13700 or Family Code section 6211.

Section 13700 defines " '[d]omestic violence' " as "abuse committed" against specified persons, including a "person with whom the suspect has had a child or is having or has had a dating . . . relationship." (§ 13700, subd. (b).) " 'Abuse' " is defined as, among other things, "placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (*Id.*, subd. (a).)

Family Code section 6211 similarly defines " '[d]omestic violence' " as "abuse perpetrated" against specified persons, including "[a] person with whom the [defendant] is having or has had a dating . . . relationship" or "with whom the [defendant] has had a child." (Fam. Code, § 6211, subds. (c), (d).)

"[A]buse" for purposes of Family Code section 6211 is defined in Family Code section 6203. Like section 13700, Family

4

Code section 6203 includes in the definition of abuse "[t]o place a person in reasonable apprehension of imminent serious bodily injury to that person or to another." (Fam. Code, § 6203, subd. (a)(3).) Family Code section 6203 also defines as "abuse" "any behavior that has been or could be enjoined pursuant to [Family Code] section 6320." (Fam. Code, § 6203, subd. (a)(4).)

Behavior that may be enjoined under Family Code section 6320 includes, among other things, "molesting, attacking, striking, stalking, *threatening*, sexually assaulting, battering, . . . harassing, . . . or disturbing the peace of the other party." (Fam. Code, § 6320, subd. (a), italics added.)

In sum, because threats are among the acts subject to injunction under Family Code section 6320, subdivision (a), they constitute "abuse" under Family Code section 6203, subdivision (a)(4), and constitute "domestic violence" under Family Code section 6211 when perpetrated against a person with whom the defendant has a child or has had a dating relationship.

Caceres does not dispute that he was convicted of making criminal threats under section 422[3], and that the person he

---

[3] Section 422, subdivision (a) provides, in relevant part, "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be

threatened was someone he had dated and with whom he had a child.  Thus, under Family Code section 6211, he committed an act of domestic violence, subjecting him to a protective order under section 136.2, subdivision (i)(1).

Caceres argues that his crime was not an act of domestic violence under section 13700, because that section applies to acts causing apprehension of *imminent* injury, whereas section 422 has no imminence element.  That argument is beside the point.  Even if Caceres's crime did not meet the definition of domestic violence under section 13700, a question we do not decide, it met the broader definition under Family Code section 6211.  (See *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1144 ["Family Code section 6211 . . . defines domestic violence more broadly" than section 13700].)  The trial court did not err in issuing the protective order.

## B.  The Trial Court Properly Imposed The Assessments And Restitution Fine

Caceres contends the trial court violated his due process rights by imposing the restitution fine and court operations and criminal conviction assessments without first determining that he had the ability to pay those costs, citing *Dueñas*, *supra*, 30 Cal.App.5th 1157.

The Attorney General argues Caceres forfeited his due process challenge by not raising it in the trial court.[4]  On the

_____

punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

[4] Courts are divided as to whether the constitutional principles announced in *Dueñas* are new and reasonably unforeseeable such that appellants sentenced prior to *Dueñas* can

merits, the Attorney General disagrees with *Dueñas*'s application of due process, arguing that restitution fines instead should be evaluated under the excessive fines clause of the Eighth Amendment to the United States Constitution. The Attorney General contends that under that analysis, ability to pay is a factor, not a requirement, and that Caceres's particular fine is not grossly disproportionate to his offense. The Attorney General agrees with Caceres (and, presumably, *Dueñas*) that the court assessment fees, which are nonpunitive and which the Attorney General contends relate to defendants' access to the justice system, implicate due process and should not be imposed on defendants who lack the ability to pay them.

For the reasons we discuss below, we conclude that the due process analysis in *Dueñas* does not support its broad holding, and the extreme facts of *Dueñas* are not present on the record before us. Given these conclusions, we need not address whether Caceres has forfeited his due process challenges to the fine and assessments at issue here. As for the Attorney General's contentions regarding applicability of the Eighth Amendment, Caceres did not raise an Eighth Amendment challenge in his opening brief and we therefore decline to address that question.

---

invoke those principles despite not having raised them in the trial court. (Compare, e.g., *People v. Castellano* (2019) 33 Cal.App.5th 485, 489 [finding no forfeiture, reasoning *Dueñas* announced a new "constitutional principle that could not reasonably have been anticipated at the time of trial"] with *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154–1155 [finding forfeiture, reasoning that "*Dueñas* was foreseeable" and "applied law that was old, not new"].)

(See *People v. Spector* (2011) 194 Cal.App.4th 1335, 1372, fn. 12 [declining to address issue not raised properly in opening brief].)

### 1. *Dueñas*

Dueñas, an unemployed, homeless mother with cerebral palsy, had her driver's license suspended because "[s]he could not afford to pay the $1,088 she was assessed for" three juvenile citations.[5] (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160–1161.) Thereafter she received four misdemeanor convictions stemming from driving with a suspended license, serving jail time for each and accruing court fees she could not afford to pay. (*Id.* at p. 1161.)

Dueñas pleaded no contest to a fifth charge arising from driving with a suspended license. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1161.) When Dueñas was unable to obtain a valid license by the date of sentencing, the trial court "suspended imposition of sentence and placed Dueñas on 36 months' summary probation on the condition that she serve 30 days in county jail and pay $300, plus a penalty and assessment, or that she serve nine additional days in custody in lieu of paying the $300 fine." (*Id.* at p. 1162.) The trial court also imposed a $30 court facilities assessment under Government Code section 70373, a $40 court operations assessment under

---

[5] The *Dueñas* court noted that "the Legislature recently amended several statutes to prohibit the courts and the Department of Motor Vehicles from suspending a driver's license because of an unpaid traffic citation." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164, fn 1, citing Stats. 2017, ch. 17, §§ 51–54, eff. June 27, 2017.)

8

section 1465.8, and a $150 restitution fine under section 1202.4. (*Ibid.*)

At Dueñas's request, the trial court held a hearing to determine her ability to pay the two court assessments and restitution fine imposed on her.[6] (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1162–1163.) Dueñas presented an uncontested declaration establishing her indigent financial circumstances. (*Id.* at p. 1163.) The trial court ruled that the $30 and $40 assessments were mandatory regardless of Dueñas's ability to pay, and that Dueñas had not shown the " 'compelling and extraordinary reasons' " required to waive the restitution fine. (*Ibid.*)

The Court of Appeal reversed, holding that due process prohibits a trial court from imposing court facilities and court operations assessments, and requires the trial court to stay execution of any restitution fines, until the trial court ascertains the defendant has the ability to pay those assessments and fines.[7] (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.)

Key to the court's holding was its concern for "the cascading consequences of imposing fines and assessments that a defendant cannot pay," which "[t]he record in this matter illustrates." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1163.) The court noted that

---

[6] Dueñas also requested that the trial court determine her ability to pay attorney fees assessed against her in an earlier proceeding. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1162.) The trial court "determined that [Dueñas] lacked the ability to pay the previously ordered attorney fees, and waived them on the basis of her indigence." (*Id.* at p. 1163.)

[7] The *Dueñas* court addressed the validity only of the two court assessments and $150 restitution fine imposed on Dueñas, and did not address the other conditions of her probation.

9

Dueñas's case " 'doesn't stem from one case for which she's not capable of paying the fines and fees,' but from a series of criminal proceedings driven by, and contributing to, Dueñas's poverty. Unable to pay the fees for citations she received when she was a teenager, Dueñas lost her driver's license. Like many who are 'faced with the need to navigate the world and no feasible, affordable, and legal option for doing so' [citation], she broke the law and continued to drive. As a result, Dueñas now has four misdemeanor convictions for driving without a valid license. These, in turn, have occasioned new fines, fees, and assessments that she is unable to pay. . . . [T]he repeat criminal proceedings have caused her financial obligations to 'snowball.' " (*Id.* at p. 1164.) The court referenced "the counterproductive nature of this system and its tendency to enmesh indigent defendants in a cycle of repeated violations and escalating debt." (*Id.* at p. 1164, fn. 1.)

In support of its due process argument, the *Dueñas* court analogized the court assessments imposed on Dueñas to court fees in other contexts that indigent individuals were not required to pay. The *Dueñas* court referenced statutes allowing for waiver of court fees and costs for indigent civil litigants, noting that similar relief was not available in the criminal context. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1165–1166.) The court cited *Griffin v. People of the State of Illinois* (1956) 351 U.S. 12 (*Griffin*) and *Mayer v. City of Chicago* (1971) 404 U.S. 189 (*Mayer*), cases holding that requiring indigent criminal defendants to pay for trial transcripts in order to prosecute their appeals was unconstitutional. (*Dueñas*, at pp. 1166, 1168; see *Griffin*, at pp. 13–14, 19–20; *Mayer*, at pp. 196–197.)

The *Dueñas* court further opined that imposing assessments on defendants who were unable to pay them violated

10

the defendants' constitutional rights by inflicting "additional punishment" based solely on their poverty. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.) The court cited *In re Antazo* (1970) 3 Cal.3d 100 (*Antazo*) and *Bearden v. Georgia* (1983) 461 U.S. 660 (*Bearden*), which prohibited jailing or automatically revoking the probation of criminal defendants who were unable to pay fines or penalty assessments. (*Dueñas*, at pp. 1166–1167; *Antazo*, at pp. 103–104; *Bearden*, at pp. 661–662.)

The *Dueñas* court acknowledged that failure to pay court assessments subjects defendants to civil judgment and collections, but not to further imprisonment. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.) The court nonetheless held that the consequences of "[c]riminal justice debt and associated collection practices"—including damage to credit, inability to meet other financial obligations, and restriction of employment opportunities—"in effect transform a funding mechanism for the courts into additional punishment for a criminal conviction for those unable to pay." (*Ibid.*)

As for the restitution fine, the *Dueñas* court opined that imposing fines on those who cannot pay them "is neither procedurally fair nor reasonably related to any proper legislative goal. Imposing a restitution fine on 'someone who through no fault of his own is unable to make restitution will not make restitution suddenly forthcoming' [citation], and the state has no 'legitimate interest in building inescapable debt traps' for indigent residents." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1171, fn. 8.)[8] The court cautioned that requiring payment from

---

[8] The language we quote here is from a footnote in *Dueñas* ostensibly analyzing whether restitution fines imposed on indigent defendants "also violate[ ] the bans on excessive fines in

11

indigent defendants " 'may have the perverse effect of inducing the probationer to use illegal means to acquire funds to pay in order to avoid' the additional negative consequences." (*Id.* at p. 1167.)[9]

The *Dueñas* court also noted that defendants on probation who comply with all conditions of that probation, including payment of restitution fines, are entitled by statute to have their charges dismissed, whereas defendants who cannot pay them

---

the United States and California Constitutions." (*Dueñas, supra,* 30 Cal.App.5th at p. 1171, fn. 8.) The *Dueñas* court made clear however, that its excessive fines reasoning applied equally to its due process analysis. The *Dueñas* court stated that excessive fines analysis was "sufficiently similar" to due process analysis "that '[i]t makes no difference whether we examine the issue as an excessive fine or a violation of due process.' " (*Ibid.*) In fact, the constitutional test the *Dueñas* court invoked for "the excessive fine context," namely that a penalty be " 'procedurally fair and reasonably related to a proper legislative goal' " (*ibid.*), was quoted from *Hale v. Morgan* (1978) 22 Cal.3d 388, 398 (*Hale*), a case analyzing the constitutional validity of statutory penalties under due process. (See *Hale*, at p. 398.) We do not address whether *Dueñas* was correct in equating due process analysis with excessive fines analysis because Caceres did not raise an excessive fines challenge in his opening brief.

[9] In the section of the *Dueñas* opinion discussing the court assessments, the court similarly argued that "[i]mposing unpayable fines on indigent defendants is not only unfair, it serves no rational purpose, fails to further the legislative intent, and may be counterproductive." (*Dueñas, supra,* 30 Cal.App.5th at p. 1167.) Although the quoted language is directed at "fines," given its placement in the opinion we presume the *Dueñas* court intended its rational basis analysis to apply to court assessments as well.

"[a]t best . . . can try to persuade a trial court to exercise its discretion to grant them relief." (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1170–1171, citing § 1203.4, subd. (a)(1).) The *Dueñas* court deemed this disparity violative of due process. (*Id.* at p. 1171.)[10]

## 2. Analysis

*Dueñas* announced a broad constitutional rule, one that has the potential to impose a new procedural requirement on our trial courts in every or nearly every criminal proceeding. It did so based on the peculiar facts of that case, facts that several appellate courts have described as "extreme." (*People v. Santos* (Aug. 15, 2019, H045518) __ Cal.App.5th __ [2019 Cal.App.Lexis 759, p. *1] (*Santos*); *People v. Kopp* (2019) 38 Cal.App.5th 47, 94 (*Kopp*)). Although we do not reach whether *Dueñas* was correctly decided as to those extreme facts, in our view, the due process analysis in *Dueñas* does not justify extending its holding beyond those facts. (See *Kopp*, at p. 94 ["Although we do not reject *Dueñas* outright, we urge caution in following that case and announcing a significant constitutional rule without regard to the extreme facts *Dueñas* presented"].)

The following observations illustrate our concern with the due process analysis in *Dueñas*:

First, *Dueñas* drew what we regard as an inapt analogy between court assessments imposed following a criminal conviction and fees that, if imposed on indigent litigants or criminal defendants, impede their access to the courts in the first place. The Legislature and courts rightly are concerned when

---

[10] This section of the *Dueñas* opinion is inapplicable here, where the trial court denied Caceres probation, and we do not address it further.

13

filing fees and other court costs prevent indigent individuals from having their day in court.  Fees imposed *after* a case is completed, and judgment entered, however, do not deprive defendants of access to justice.[11]  (See *Santos*, *supra*, __ Cal.App.5th __ [2019 Cal.App.Lexis 759, p. *22] (Elia, J., dis. opn.) ["a convicted person's inability to pay a court operations assessment or a court facilities assessment [does not] in any way impact that person's ability to access the courts"]; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1039 (*Gutierrez*) (Benke, J., conc. & dis. opn.) ["the imposition of the two assessments and one restitution fine on the defendant in *Dueñas* was not an issue of *access* to the courts or our system of justice"].)

Second, *Dueñas* equated the civil judgment and consequences thereof faced by defendants who do not pay their court assessments as "additional punishment" to which only indigent defendants are subject.  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.)  Although civil judgments potentially can have significant negative consequences, not only for indigent individuals but also for any civil defendant, *Dueñas* cites no authority for the proposition that those consequences constitute "punishment" rising to the level of a due process violation.  We note that the cases upon which *Dueñas* relied, *Antazo* and *Bearden*, involved defendants who, because of their poverty, were exposed to additional *criminal* penalties.  (See *Santos*, *supra*, ___ Cal.App.5th ___ [2019 Cal.App.Lexis 759, p. *24] (Elia, J., dis. opn.) [noting that unlike the laws challenged in *Antazo* and

---

[11]  We acknowledge that the Attorney General in his appellate briefing took the opposite position and agreed with *Dueñas* that nonpunitive court assessments implicate due process when imposed on those who cannot pay them.

*Bearden*, the statutes requiring payment of court assessments "deprive no one of their fundamental right to liberty based on their indigence"]; see also *Gutierrez*, *supra*, 35 Cal.App.5th at p. 1039 (Benke, J., conc. & dis. opn.) [fines and fees imposed in *Dueñas* did not "satisf[y] the traditional due process definition of a taking of life, liberty or property"].) For the same reason, *Dueñas* fails to persuade us that imposition of a $300 restitution fine, nonpayment of which subjects a defendant only to civil remedies (see § 1202.43, subd. (b)), constitutes additional punishment when imposed on those who cannot pay it, as Caceres appears to contend.

Third, we disagree with *Dueñas* that imposing fees or fines on defendants who cannot pay "is neither procedurally fair nor reasonably related to any proper legislative goal." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1171, fn. 8). Raising funds for victim restitution and court operations and facilities unquestionably are proper legislative goals, and there is no indication that the postconviction assessment and fines statutes do not serve those goals. *Dueñas* objects only to the rationality of seeking those funds from indigent defendants.

In determining whether a statute is " ' " 'reasonably related to a proper legislative goal,' " ' " however, " '[t]he wisdom of the legislation . . . is not at issue, and neither the availability of less drastic remedial alternatives nor the legislative failure to solve all related ills at once will invalidate a statute.' " (*People v. Munoz* (2019) 31 Cal.App.5th 143, 160.) By holding that trial courts must tailor the imposition of costs to each defendant's ability to pay, *Dueñas* in effect proposes a " 'less drastic remedial alternative' " to the current statutory scheme, which is more than what due process requires. Given *Dueñas's*

15

unique facts, we eschew a conclusion that the entire system of imposing postconviction fees and fines is irrational and contravenes due process.

In light of our concerns with the due process analysis in *Dueñas*, we decline to apply its broad holding requiring trial courts in all cases to determine a defendant's ability to pay before imposing court assessments or restitution fines.

We need not decide whether *Dueñas* was correctly decided as applied to its facts, because it is evident that those facts, as *Dueñas* characterizes them, are not present here. More specifically, in the *Dueñas* court's view, Dueñas lost her driver's license because she was too poor to pay her juvenile citations, then continued to offend because the aggregating criminal conviction assessments and fines prevented her from recovering her license. The *Dueñas* court described this as "cascading consequences" stemming from "a series of criminal proceedings driven by, and contributing to, [a defendant's] poverty." (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1163–1164.)

In contrast, Caceres's offense, criminal threats, on its face is not a crime either "driven by" poverty or likely to "contribut[e] to" that poverty such that an offender is trapped in a "cycle of repeated violations and escalating debt." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164 & fn. 1.) A person may avoid making criminal threats regardless of his or her financial circumstances, and the imposition of $370 in fees and fines will not impede Caceres's ability to avoid making criminal threats in the future.

As set forth above, to the extent Caceres cannot pay the imposed costs and is subject to a civil judgment, we are not persuaded that such a consequence violates due process. In sum, the trial court did not violate Caceres's due process rights by

16

imposing the assessments and restitution fine without first ascertaining his ability to pay them.

## DISPOSITION

The judgment is affirmed.
<u>CERTIFIED FOR PUBLICATION.</u>


BENDIX, J.


We concur:


ROTHSCHILD, P. J.


CHANEY, J.