**STATE of Iowa, Appellee,**

v.

**Dale LeRoy SNYDER, Appellant.**

No. 54944.

Supreme Court of Iowa.

Dec. 20, 1972.

Paul D. Strand, Decorah, for appellant.

Richard C. Turner, Atty. Gen., Robert D. Jacobson, Asst. Atty. Gen., Thomas C. Lynch, County Atty., for appellee.

Heard before MOORE, C. J., and MASON, RAWLINGS, LeGRAND and REES, JJ.

MASON, Justice.

This is an appeal by Dale LeRoy Snyder from judgment entered on a jury verdict convicting him of operating a motor vehicle while under the influence of an alcoholic beverage contrary to section 321.281, The Code. He was sentenced to be confined in the Winneshiek County jail for three months and fined $300. The three-month jail sentence was suspended during defendant's good behavior and he was placed on probation for a period of one year. The court directed that in default of payment of the fine imposed defendant should be confined in the county jail until such fine was paid at the rate of $5.00 per day.

November 23, 1970, a Decorah police officer observed defendant's vehicle stopped at the traffic light at a Decorah intersection. Defendant made no attempt to proceed through the intersection even though the traffic lights were green. A line of traffic approximately one and a half blocks long had formed behind defendant's automobile. After observing defendant slumped over the steering wheel of his automobile, the officer parked the patrol car, returned to defendant's automobile, and found the motor running. After some investigation, the officer drove Snyder's car to the police station.

At the police station the officer administered the "road test" of sobriety, namely, placing one's fingertips together with arms outstretched and eyes closed, walking in a straight line heel to toe, and picking up an object off the floor. Snyder was only successful in touching his fingertips, after several attempts.

Snyder then agreed to submit to a blood test to determine his condition, and the police radio operator called "Medical Associates" and requested a doctor for the taking of a blood sample.

Frank Riha, a medical technologist at the Winneshiek County Memorial Hospital, arrived at the station a short time later. He then withdrew a sample of blood from the defendant from the purpose of determining the alcoholic content of Snyder's blood.

Defendant asserts the trial court erred: (1) in admitting results of defendant's blood test into evidence; (2) in imposing a sentence calling for incarceration for nonpayment of fine; and (3) in ordering a $5.00 per day credit on the unpaid fine for each day of confinement.

I. Minutes of evidence filed with the county attorney's information in this matter notified defendant Frank Riha would testify he was a medical technologist and had withdrawn a sample of blood from defendant.

At trial, Riha testified he was a medical technologist employed at the Winneshiek County Memorial Hospital and that he had withdrawn a sample of blood from defendant. Riha stated his formal education involved a two-year period of training and a six-month internship at the Medical Institute of Minnesota; that upon completion of this training, he received a degree R.M.T., Registered Medical Technologist. After serving his internship he was drafted by the army, sent to a technician school and sent to Brooks General Hospital in San Antonio, Texas, where he served as a medical technician for eight months. He testified he was licensed in Iowa as a registered medical technologist.

Riha was not affiliated with American Society of Clinical Pathologists which gives an A.S.C.P. degree after satisfactory completion of three years of regular college and a year of internship.

Defendant made timely objection to Riha's testimony and admission of the results

of the blood test on the ground Riha was not a medical technologist, one of the specified persons authorized by section 321B.4, The Code, to withdraw body substances for the purpose of determining the alcoholic content of a person's blood.

This section provides in part:

"Taking sample for test. Only a licensed physician, or a medical technologist or registered nurse designated by a licensed physician as his representative, acting at the written request of a peace officer may withdraw such body substances for the purpose of determining the alcoholic content of the person's blood."

It is pointed out in the record that Mr. Riha was requested by Doctor Dynes, a licensed physician practicing in Decorah, to withdraw the specimen of blood from defendant at the police station.

As we understood defendant's argument he maintains that only a person meeting the academic requirements for an A.S.C.P. degree (American Society of Clinical Pathologists), that is, a person with three years of collegiate education and one year of internship can qualify as a medical technologist who is authorized to take blood specimens under the provisions of section 321B.4.

In support of this contention defendant offered testimony of a medical technologist at the Winneshiek County Memorial Hospital who had a degree from the American Society of Clinical Pathologists. This lady had three years of college and one year of internship. She received a four-year degree from Gustavus Augustus College. She expressed familiarity with the term "medical technicians" and acquaintance with their qualifications as distinguished from her own. The witness stated that a person having an A.S.C.P. degree has a much broader education than those termed "medical technicians" at the hospital and had been certified by the board of the American Society of Clinical Pathologists.

On cross-examination the witness was asked, "Is there any Official Body that makes a clear distinction between a 'Technologist' and 'Technician', so far as your standings are concerned? Any Medical Board, of any kind that you know of?" She answered, "Just the 'A.S.C.P.'"

In rebuttal, Doctor Conrad E. Larson, a pathologist on the staff of the Winneshiek County Memorial Hospital, testified he was a member of the American Society of Clinical Pathologists. As a pathologist he was in charge of all laboratory procedures conducted at the hospital. On cross-examination he was asked for his definition of a "medical technologist" and whether in his opinion there was a difference between a "medical technician" and a "medical technologist." The doctor expressed the opinion that "in common parlance" the terms are synonymous. He explained that "there are other groups in the country, which also have registered and training programs and affiliations not associated with the American Society of Clinical Pathologists, that call themselves as one group, the American Medical Technologists. And others Registered Medical Technologists. These two latter groups have approximately one year of training, not associated with a college of any sort, and are trained in doing laboratory procedures in drawing blood. And they call themselves Medical Technologists. In this sense, 'Medical Technologists' and 'Medical Technician', is a synonymous term."

A computer search for references to the terms "medical technician" and "medical technologist" reveals that these terms appear in eleven sections and eight chapters of The Code. These sections are: 749A.2, 496C.2, 218.8, 204A.2, 153.32, 148A.3 and chapters 135B which includes the act relating to pathology and radiology services in hospitals (sections 135B.19 through 135B.-32) and 321B.

Section 135B.20(3) provides: "'Technician' shall mean technologist as well."

Section 135B.22 has this provision:

"Character of services. Pathology and radiology services performed in hospitals are the product of the joint contribution of hospitals, doctors and technicians but these services constitute medical services which must be performed by or under the direction and supervision of a doctor, and no hospital shall have the right, directly or indirectly, to direct, control or interfere with the professional medical acts and duties of the doctor in charge of the pathology or radiology facilities or of the technicians under his supervision. * * *."

Section 135B.24 contains this statement: "Employees. Unless the department is leased or unless the hospital and doctor mutually agree otherwise, technicians and other personnel, not including doctors, shall be employees of the hospital, * * *."

Section 135B.25 provides:

"Hiring and dismissal of technicians. The doctor and hospital shall mutually agree upon the employment of any technicians necessary for the proper operation of said department and no technicians shall be dismissed from said employment without the mutual consent of the parties, provided, however, that in the event the hospital and doctor are unable mutually to agree upon the hiring or discharge or disciplining of any employee of said department, the matter shall be promptly submitted to the joint conference committee for final determination."

The term "technologist" appears only in that portion of section 321B.4 set out, supra, the statute involved in this litigation, and is not defined in chapter 321B which was enacted in 1963 by the Regular Session of the Sixtieth General Assembly as chapter 114. That section became effective six years after the Regular Session of the Fifty-seventh General Assembly had enacted what is now code section 135B.20, supra, declaring that as used in the division of chapter 135B dealing with pathology and radiology services in hospital law, "technician" shall mean "technologist" as well.

Doctor Larson testified he relied on Dorlan's Medical Dictionary in defining the word "technologist" as "technician" and "technician" as a person trained in and expert in the performance of technical procedures.

However, under the record there can be no doubt the educational requirements for certification as a medical technologist by the American Society of Clinical Pathologists are more exacting than those required for Riha's certificate or degree.

The question is whether the legislature intended by specifying medical "technologist" as one of those authorized to perform the procedures permitted in section 321B.4 that such person have the same educational background demanded by the A.S.C.P. for certification. In this connection we point out that Walden Heino, a professor of chemistry at Luther College, performed the chemical analysis of the blood sample delivered to him by Riha. Professor Heino's qualifications to perform the chemical procedure are not involved, only Riha's qualifications to withdraw body substance by artificial means as a medical technologist.

We approach this problem in light of Doctor Larson's testimony that there are are other groups not associated with A.S.C.P. that call themselves "American Medical Technologists" or "Registered Medical Technologists" who do not have the educational requirements for certification as are required for an A.S.C.P. degree.

█ It has been said the obvious legislative purpose in requiring certain qualifications of those authorized to withdraw blood or other body substance from an individual by artificial means was to protect his health, guard against any claim of resultant infection or pain and to insure, so far as humanly possible, accuracy of various tests for determining alcoholic content of the person's blood. Janson v. Fulton, 162 N.

W.2d 438, 442–443 (Iowa 1968); State v. Hraha, 193 N.W.2d 484, 488 (Iowa 1972).

To achieve this purpose the legislature designated three classes of persons authorized to withdraw body substance by artificial means, licensed physicians, medical technologists and registered nurses.

Defendant's argument that only a person with the educational background required for an A.S.C.P. degree can qualify as a medical "technologist" under section 321B.-4 loses its force when confronted by the fact the legislature also specified "a registered nurse" as a person authorized under this section. Examination of chapter 152, The Code, which governs the practicing of nursing, discloses that a two-year period of study is required of applicant for a license to practice nursing as a registered nurse. Section 152.1 defines a registered nurse as one " * * * who performs any professional services requiring the application of principles of biological, physical or social sciences and nursing skills in the observation of symptoms, reactions and the accurate recording of facts in carrying out of treatments and medication prescribed by licensed physicians in the care of the sick, in the prevention of disease or in the conservation of health."

To obtain a license to practice nursing as a registered nurse, the individual must "be a graduate of an accredited high school or the equivalent and have completed a course of study in, and hold a diploma issued by a school of nursing for registered nurses approved by the board of nurse examiners; * * *." Section 152.3(3), The Code.

■ We conclude the legislature did not intend that an individual have the educational background required by the American Society of Clinical Pathologists in order to qualify as a medical technologist under section 321B.4. If it had it would have been a simple task to follow the words "medical technologist" with the phrase "holding an A.S.C.P. degree or its equivalent."

The court did not err in admitting results of defendant's blood test into evidence.

II. Defendant's second assignment of error appears to raise two issues: one, whether defendant's claim in this court that he was denied equal protection of the law under Amendment 14 of the United States Constitution is premature; and two, whether this defendant may be committed to jail if he fails to make *immediate* payment of the $300 fine. The issues will be considered in this order.

The record does not indicate defendant filed any motion after sentence was pronounced by the trial court to inform the court of defendant's indigency as a basis for modification or vacation of its judgment because of defendant's inability to pay the fine in one lump sum.

The State points out defendant has not requested the court to adopt an alternative method to satisfy the fine; if defendant's indigency were shown to the court, it is probable he would be permitted to pay the fine in installments. In support of this contention, the State filed an affidavit sworn to by the Winneshiek county attorney, wherein affiant stated: "The general practice in Winneshiek County is that when a fine is assessed as part of a sentence the Court will allow the defendant to pay it off in installments."

Further, the State argues that the portion of the court's judgment and sentence calling for defendant's incarceration "in default" of payment of the $300 fine applies only if defendant *refuses* to pay the fine, not if he is unable to pay, "and such refusal may be the only condition under which the court will sanction imprisonment for failure to pay the fine;" that this kind of conditional sentence is proper under Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130.

Although factually distinguishable, a case that discusses this question is Harris v. United States, 142 U.S.App.D.C. 212, 440

F.2d 240, 241. In *Harris* the sole issue raised by appellant was whether the court erred in imposing upon an indigent defendant the alternative sentence of 30 days in jail and a fine of $500 or 90 days in jail. The court of appeals, however, never reached appellant's claim since the record could not support an assumption that the trial judge was aware defendant was indigent. In affirming the lower court without prejudice to the filing of a post-sentence motion, the court of appeals observed:

" * * * A judge of the Court of General Sessions did appoint an attorney for the defendant at a preliminary stage, but that was not an appointment under the Criminal Justice Act, and it did not require a finding or adjudication of indigency. When the case came on for trial, the defendant advised the court that he would try the case *pro se*, and that he had decided upon this course in the light of the experience he had gained as an employee for a court stenographer. This fact of employment, together with the evidence identifying defendant as the owner of two rooming houses, were if anything indications pointing away from a condition of indigency. If the defendant wished the trial judge to take into account an indigent or inadequate financial condition he should have filed a motion to vacate or modify the judgment of fine or imprisonment in lieu of paying the fine. This was the procedure that presented the issue decided in Williams v. Illinois, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970). In that case, the defendant filed a post-sentence petition which alleged indigency and requested the judge to vacate the portion of the order confining him to jail because of nonpayment of the fine. In the absence of such procedure *there is no basis on this record* for concluding that the trial judge was alerted to the consideration that appellant argues to this court renders his sentence invalid." (Emphasis supplied)

In the course of its opinion the court in *Harris* noted that defendant's constitutional argument assumed the trial judge was aware defendant was indigent but that the record did not support such assumption.

This is not the factual situation presented in the matter before us.

At arraignment Snyder requested the court appoint counsel to represent him at public expense, sections 775.4 and 775.5, The Code, and filed an affidavit in support showing his financial condition. Counsel was appointed by a judge of the Winneshiek district court other than the trial judge. Following pronouncement of sentence defendant filed application for appointment of counsel to perfect appeal to this court. He again filed an affidavit showing his financial condition. The trial judge appointed counsel at public expense to perfect defendant's appeal.

■ Snyder's affidavits were sufficient to satisfy the trial court defendant was unable to employ counsel. They also support an assumption the trial court was aware Snyder could not make an immediate payment of the $300 fine because of indigency.

The State's argument that defendant's contention is premature is without merit.

III. In the instant case, both a fine and a jail sentence were imposed with service of the jail sentence being suspended and defendant placed on probation for a period of one year; the court further directed that defendant be required to serve out the fine at the rate of $5.00 per day in default of payment.

Section 789.17, The Code, makes provision for imprisonment for nonpayment of a fine to the extent of one day for every three and one-third dollars of the fine.

Having determined that the trial court was aware defendant was indigent, the question then becomes whether the likely imprisonment of this convicted defendant solely because he cannot make immediate payment of a fine by reason of indigency is a deprivation of his liberty in violation of rights secured to him by the equal pro-

tection clause of Amendment 14 of the United States Constitution, irrespective of the monetary amount of credit toward payment of the fine established by section 789.-17. See Williams v. Illinois, 399 U.S. 235, 259, 90 S.Ct. 2018, 2031, 26 L.Ed.2d 586, 603, (dissenting opinion), wherein Mr. Justice Harlan again invokes the "due process" clause rather than the majority's "equal protection" analysis, and Griffin v. Illinois, 351 U.S. 12, 34–36, 76 S.Ct. 585, 595–599, 100 L.Ed. 891, 906–907, 908 (dissenting opinion).

There can be no dispute that the operative effect of the Iowa statute as applied by the trial court in sentencing Snyder is to create two classes of convicted defendants indistinguishable from each other except that one is able to pay the fine and can avoid imprisonment, and the second cannot satisfy the fine and therefore cannot escape imprisonment.

Distinctions in the administration of criminal justice between rich and poor are generally not likely to bear up under constitutional scrutiny. Such economic discrimination falls squarely within the protection of Amendment 14. In decisions following the landmark case of Griffin v. Illinois, 351 U.S. at 17–19, 76 S.Ct. at 590–591, 100 L.Ed. at 898–899, requiring states to afford the same rights to transcripts to indigent defendants as those afforded nonindigent defendants, the Supreme Court of the United States has steadfastly invoked the equal protection and due process clauses to protect defendants from invidious discrimination on account of poverty. In *Griffin*, the Court declared:

" * * * In criminal trials a State can no more discriminate on account of poverty than on account of religion, race, or color.

" * * *

" * * * Such a denial [of a free transcript] is a misfit in a country dedicated to affording equal justice to all and special privileges to none in the administration of its criminal law. There can be no equal

justice where the kind of trial a man gets depends on the amount of money he has."

It is apparent we are here confronted with an example of discrimination between two classes of convicted defendants, and the poor man—affluent man argument obtains. That the different treatment accorded the rich defendant and the poor one is unintended does not preclude an attack on section 789.17, The Code, as applied to this defendant, on the ground it offends the equal protection clause of Amendment 14.

This "suspect" classification of indigent defendants incarcerated for nonpayment of a fine would seem to be unconstitutional, "unless shown to be necessary to promote a *compelling* governmental interest." Shapiro v. Thompson, 394 U.S. 618, 633–634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600, 615. The question whether the state has a compelling interest which justifies the effect of the statute as applied, viz., the imprisonment of defendant for nonpayment of the $300 fine, involves a consideration of three recent United States Supreme Court cases dealing with imprisonment imposed upon indigent defendants for nonpayment of fines, and which "reaffirm allegiance to the basic command that justice be applied equally to all persons." Williams v. Illinois, 399 U.S. at 241, 90 S.Ct. at 2022, 26 L.Ed.2d at 593.

In Williams v. Illinois, supra, the indigent defendant, Williams, received the *maximum* sentence of a year in prison and a $500 fine plus a $5.00 assessment in court costs. The judgment provided that if Williams was in default of the payment of the fine and costs at the expiration of the one-year sentence, he must remain in jail beyond one year to work off his debt at the rate of $5.00 per day. Williams was unable to pay the fine and costs, and he was ordered to remain in jail 101 days after the termination of the one-year sentence. The Court vacated the judgment and said:

" * * * Default imprisonment has traditionally been justified on the ground it is a coercive device to ensure obedience to

the judgment of the court. Thus, commitment for failure to pay has not been viewed as a part of the punishment or as an increase in the penalty; rather, it has been viewed as a means of enabling the court to enforce collection of money that a convicted defendant was obligated by the sentence to pay. The additional imprisonment, it has been said, may always be avoided by payment of the fine.

" * * *

" * * * Here the Illinois statute as applied to Williams works an invidious discrimination solely because he is unable to pay the fine. On its face the statute extends to all defendants an apparently equal opportunity for limiting confinement to the statutory maximum simply by satisfying a money judgment. In fact, this is an illusory choice for Williams or any indigent who, by definition, is without funds. Since only a convicted person with access to funds can avoid the increased imprisonment, the Illinois statute in operative effect exposes only indigents to the risk of imprisonment beyond the statutory maximum. By making the maximum confinement contingent upon one's ability to pay, the State has visited different consequences on two categories of persons since the result is to make incarceration in excess of the statutory maximum applicable only to those without the requisite resources to satisfy the money portion of the judgment.

" * * *

" * * * We hold only that a State may not constitutionally imprison beyond the maximum duration fixed by statute a defendant who is financially unable to pay a fine. * * * We have no occasion to reach the question whether a State is precluded in any other circumstances from holding an indigent accountable for a fine by use of a penal sanction. We hold only that the Equal Protection Clause of the Fourteenth Amendment requires that the statutory ceiling placed on imprisonment for any substantive offense be the same for all defendants irrespective of their eco-

nomic status." *Id.* at 240–244, 90 S.Ct. at 2022–2024, 26 L.Ed.2d at 594.

The companion case to *Williams* is Morris v. Schoonfield, 399 U.S. 508, 90 S.Ct. 2232, 26 L.Ed.2d 773. In a *per curiam* opinion, the Supreme Court remanded the *Morris* case to the district court for reconsideration in light of *Williams*. Mr. Justice White, with whom Mr. Justice Douglas, Mr. Justice Brennan and Mr. Justice Marshall joined, concurred specially, stating that:

" * * * [T]he same constitutional defect condemned in *Williams* also inheres in jailing an indigent for failing to make immediate payment of any fine, whether or not the fine is accompanied by a jail term and whether or not the jail term of the indigent extends beyond the maximum term that may be imposed on a person willing and able to pay a fine. In each case, the Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full.

"As I understand it, Williams v. Illinois does not * * * finally answer the question whether the State's interest in deterring unlawful conduct and in enforcing its penal laws through fines as well as jail sentences will justify imposing an 'equivalent' jail sentence on the indigent who, despite his own reasonable efforts and the State's attempt at accommodation, is unable to secure the necessary funds. But *Williams* means, at minimum, that in imposing fines as punishment for criminal conduct more care must be taken to provide for those whose lack of funds would otherwise automatically convert a fine into a jail sentence." *Id.* at 509, 90 S.Ct. at 2233, 26 L.Ed.2d at 774.

The foregoing interpretation of *Williams* was adopted by the court in Tate v. Short, 401 U.S. 395, 398–399, 91 S.Ct. 668, 670–671, 28 L.Ed.2d 130, 133–134. In *Tate*, defendant accumulated fines of $425 on nine convictions for traffic offenses, which was the

only punishment authorized to be imposed for such offense under Texas law. Unable to pay the fines because of indigency, a municipal court sentenced the defendant to the municipal prison for 85 days ($5.00 per day). The Court reversed the trial court's judgment and held:

" * * * [L]ike Williams, petitioner was subjected to imprisonment solely because of his indigency. * * *

" * * * Since Texas has legislated a 'fines only' policy for traffic offenses, that statutory ceiling cannot, consistently with the Equal Protection Clause, limit the punishment to payment of the fine if one is able to pay it, yet convert the fine into a prison term for an indigent defendant without means to pay his fine. Imprisonment in such a case is not imposed to further any penal objective of the State. It is imposed to augment the State's revenues but obviously does not serve that purpose; the defendant cannot pay because he is indigent and his imprisonment, rather than aiding collection of the revenue, saddles the State with the cost of feeding and housing him for the period of his imprisonment."

In factual settings similar to the case at bar, other courts have determined that imprisonment of an indigent defendant for nonpayment of a fine is not necessary to promote a compelling state interest, and constitutes invidious discrimination based on poverty in violation of the equal protection clause of Amendment 14. See In Re Antazo, 3 Cal.3d 100, 89 Cal.Rptr. 255, 473 P.2d 999; Johnson v. State, 250 So.2d 347 (Fla.App.1971); State v. Tackett, 52 Hawaii 601, 483 P.2d 191; Spurlock v. Noe, 467 S.W.2d 320 (Ky.1971); State v. De Bonis, 58 N.J. 182, 276 A.2d 137; In Re Jackson, 26 Ohio St.2d 51, 268 N.E.2d 812; Rutledge v. Turner, 495 P.2d 119 (Okl.Cr. 1972); State v. Walding, 477 S.W.2d 251 (Tenn.1972); and Frazier v. Jordan, 457 F.2d 726 (5 Cir.1972).

It should be noted that unlike *Williams*, Snyder's imprisonment for nonpayment of his fine would not result in a total term of imprisonment in excess of the statutory maximum.

Section 321.281, The Code, under which defendant was convicted, prescribes that upon conviction a defendant shall be punished for the first offense by a fine of not less than three hundred dollars nor more than one thousand dollars, or by imprisonment in the county jail for a period of not to exceed one year, or by both such fine and imprisonment.

It is obvious the substituted jail sentence which Snyder would experience if he did not pay the fine would not take his confinement beyond the prescribed maximum jail term for the specific violation of which he stood convicted.

The likely argument that because of this factual distinction *Williams* does not apply to the matter before us has been effectively answered in State v. De Bonis, 58 N.J. at 192–194, 276 A.2d at 143–144, where the court made the following observation in regard to the *Williams* opinion:

" * * * Although *Williams* stressed the fact that the incarceration extended beyond the maximum term for the specific offense, it is clear that if the equal protection clause was thereby violated, a violation must also be found whenever a man is required to serve time because he is unable to pay a fine. For if it discriminates invidiously against an indigent to jail him for nonpayment of a fine, the discrimination is the same whether or not a jail sentence was imposed and without regard to the length of the jail term if there was one. Hence the equal protection claim pressed before us must be considered in the light of everything that *Williams* said, notwithstanding that *Williams* purported to decide the issue only as to the precise factual pattern before it." (Emphasis in the original)

Also, " * * * a full reading of *Williams* reveals that its thrust was against a statutory scheme which instantly translated a fine into a jail term because the defendant could not pay in full at once. The in-

vidious discrimination was found to inhere, not in the fact that a jail term replaced a fine, but in the denial to the defendant of a fair opportunity to raise the moneys and thereby to experience the same punishment which would be his if he had sufficient funds on hand." (Emphasis in the original)

The position of the New Jersey court as just stated finds substantial support in Morris v. Schoonfield, 399 U.S. at 509, 90 S.Ct. at 2233, 26 L.Ed.2d at 774, decided the same day as *Williams*. See the quotation from *Morris* set out, supra, in this division.

In State v. De Bonis the court read the *Tate* decision to be concerned with "any situation in which a jail sentence is substituted for an unpaid fine." *Id*. at 197, 276 A.2d at 145.

Of both *Tate* and *Williams*, the New Jersey court concluded that, "although they purportedly turned on circumstances which would distinguish the case before us, [they] actually embraced a principle which encompasses our situation. Both make it plain that a defendant may not be jailed merely because he cannot pay a fine in full at once."

In Spurlock v. Noe, 467 S.W.2d at 321–322 the court, after considering both *Williams* and *Tate* in dealing with an alleged illegal detention of appellant because of his inability to pay a fine imposed, said:

"We think that the teaching of Tate v. Short is that a defendant who is in custody solely and only because he cannot make immediate payment of a fine by reason of indigency must be released from custody forthwith. This does not mean, however, that the fine is extinguished or that the state is powerless to compel its payment. An indigent person may not be continued in prison for nonpayment of a fine without having been given some reasonable alternative or opportunity to satisfy the fine."

This conclusion of the Kentucky court is supported by Tate v. Short, 401 U.S. at 399, 91 S.Ct. at 671, 28 L.Ed.2d at 133–134, where, as stated, the Court held a state " * * * cannot, consistently with the Equal Protection Clause, limit the punishment to payment of the fine if one is able to pay it, yet convert the fine into a prison term for an indigent defendant without the means to pay his fine."

The court in Frazier v. Jordan, 457 F.2d 726, 728 (5 Cir.1972) rejected the possible argument that the imprisonment imposed upon Snyder for default in payment of the $300 fine is not governed by the three decisions of the Supreme Court previously discussed since, unlike the sentencing court in *Tate*, the trial court in the matter before us had authority to levy a fine or imprisonment on a defendant convicted of violating section 321.281.

The court determined that there was no constitutional significance in a similar distinction asserted in the cited case, pointing out that, " * * * the alternative fine before us creates two disparately treated classes: those who can satisfy a fine immediately upon its levy, and those who can pay only over a period of time, if then. Those with means avoid imprisonment; the indigent cannot escape imprisonment. Since the difference in treatment is one defined by wealth, the alternative fines creates a 'suspect' classification which must be tested by the compelling state interest test."

A reading of the three decisions of the United States Supreme Court which are binding on this court and those cited from other jurisdictions compel an affirmative answer to the first question stated in this division—whether the likely imprisonment of this convicted defendant solely because he cannot make immediate payment of a fine by reason of indigency is a deprivation of his liberty in violation of rights secured to him by the equal protection clause of Amendment 14 of the United States Constitution, irrespective of the monetary amount of credit toward payment of the fine established by section 789.17.

The second question in this division— whether the state has a compelling interest

which justifies the effect of the statute as applied, viz., the imprisonment of defendant for nonpayment of the $300 fine—is further answered in In Re Antazo, 3 Cal.3d at 113–114, 89 Cal.Rptr. at 263–264, 473 P.2d at 1007–1008. The court in discussing whether the practice of imprisonment for nonpayment of fines is necessary to promote any compelling state interest concluded the practice does not promote the state's interest in collection of the fines for two reasons:

"In the first place, it is not clear that imprisonment can serve the end of enforcing collection of the fine at all in the instant case. * * * As applied to indigents we fail to see how either the threat or the actuality of imprisonment can force a man who is without funds to pay a fine. * * * [citing authorities]

"In the second place, even if it is assumed that imprisonment of indigents serves the state's purpose of enforcing collection of fines, it is clear that this particular mechanism for promoting that state interest is not 'necessary' in the constitutional sense. In *Williams* the court held that the particular type of 'work-out' sentence there involved was not necessary to promote the state's legitimate interest because there existed alternative and less-intrusive means whereby the state could further its interest. * * Because the state has available to it these alternative methods of collecting fines, we cannot conclude that imprisonment of indigents is necessary to promote this state interest." (Emphasis in original).

The pronouncement quoted from Frazier v. Jordan, supra, is in accord with this analysis of the problem.

■ It is recognized that the state has a valid interest in punishing an individual who cannot pay his fine. But the state may not accomplish such a purpose by invidious discrimination between classes of defendants convicted of public offenses. Imprisonment of those who cannot make immediate payment, solely because of their indigency, is not necessary to promote any of

the state's compelling penological interests—"deterrence, retribution and rehabilitation." These legitimate penal objectives are not furthered by imprisonment of a defendant without the means to pay his fine. Other measures are available to the state "to serve its concededly valid interest in enforcing payment of fines," *such as the alternative device of installment payments.*

*Tate* referred to "solutions" the State may pursue, speaking in its footnote 5, as *Williams* did in its footnote 21, of a procedure for the payment of fines in install-. ments.

Although the trial court had apparently determined a proper punishment for Snyder's offense did not require incarceration, defendant would be unable under the court's sentence to obtain his freedom only because he did not have access to necessary funds to pay his fine in full at once.

The trial court's direction for confinement of Snyder for default in payment of his fine gives rise to a difference in treatment that constitutes invidious discrimination on the basis of wealth in violation of the equal protection clause of the United States Constitution, and section 789.17, The Code, as applied to defendant is unconstitutional.

However, in this connection we must bear in mind the undeniable premise that Snyder was fined because he offended and not because he was poor.

■ *Williams* recognized that "It is clear, of course, that the sentence was not imposed upon appellant because of his indigency but because he had committed a crime." 391 U.S. at 242, 90 S.Ct. at 2022, 26 L.Ed.2d at 593. And *Williams* recognized, too, that if a wrongdoer were insulated from punishment because of indigency, equal protection would be denied the offender who is punished. Thus *Williams* said, 399 U.S. at 244, 90 S.Ct. at 2024, 26 L.Ed.2d at 595:

"The State is not powerless to enforce judgments against those financially unable

to pay a fine; indeed, a different result would amount to inverse discrimination since it would enable an indigent to avoid both the fine and imprisonment for non-payment whereas other defendants must always suffer one or the other conviction."

In this connection we approve as stating our position this language in State v. Tackett, 483 P.2d at 192–193:

"We emphatically reject, however, the notion that justice could be achieved by eliminating the alternative of a fine and uniformly imprisoning all convicted defendants. The abolition of fines would deprive the sentencing process of much flexibility, for this form of punishment can be easily tailored to the individual defendant so as to avoid injustice. To impose imprisonment in every case would leave an indigent's plight unchanged and promote an inverse discrimination, because the employed man with funds would suffer a greater penalty.

"Should a fine be appropriate, there are methods less discriminatory than imprisonment by which the State may collect from impecuniary offenders. Moreover, these other methods should result in a savings to the State in prison maintenance expenses sufficient to outweigh any increased cost of collecting the fine."

The American Bar Association Project, Standards for Criminal Justice, Sentencing Alternatives and Procedures section 2.7(b), pages 117–123 (Approved Draft 1968) suggests procedure for Sentencing Alternatives. See also section 6.5, pages 284–294.

The Court in *Tate*, 401 U.S. at 400–401, 91 S.Ct. at 672, 28 L.Ed.2d at 134–135, said:

"We emphasize that our holding today does not suggest any constitutional infirmity in imprisonment of a defendant with the means to pay a fine who refuses or neglects to do so. Nor is our decision to be understood as precluding imprisonment as an enforcement method when alternative means are unsuccessful despite the defendant's reasonable efforts to satisfy the fines by those means; the determination of the constitutionality of imprisonment in that circumstance must await the presentation of a concrete case."

■ IV. In his remaining assignment defendant contends a five dollar per day credit on an unpaid fine for each day of confinement violates Amendment 14 when applied to an indigent.

An appendix to the opinion of the Court in Williams v. Illinois, supra, reveals that over 30 states have similar statutes providing a rate of credit of $1.00 to $5.00 per day. We believe that there is some per diem rate which is capable of comporting with fundamental fairness and equating a day in confinement with the credit of a dollar amount. This is a legislative question.

Therefore, in light of Tate v. Short, the sentence is vacated and the cause is remanded for resentencing not inconsistent with this opinion.

Reversed and remanded with directions.