STATE of Iowa, Appellant,

v.

Jerel Howard GREEN, Appellee.

No. 03–0639.

Supreme Court of Iowa.

April 7, 2004.

As Amended on Denial of Rehearing
June 11, 2004.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, Matt Wilber, County Attorney, Christine M. DeLorme, Assistant County Attorney, and Tina Kaeding, Student Legal Intern, for appellant.

Patrick A. Sondag, Council Bluffs, for appellee.

CADY, Justice.

In this appeal, we consider whether a phlebotomist is qualified to "withdraw a specimen of blood for the purpose of determining the alcohol concentration" in a prosecution for operating a motor vehicle while intoxicated. Iowa Code § 321J.11 (2003). The district court concluded that a phlebotomist is not included in the list of individuals who may withdraw a blood sample for testing and suppressed evidence of the defendant's blood alcohol concentration garnered from a sample obtained by a phlebotomist. The State sought discretionary review of the district court's decision, and we now reverse and remand this case for further proceedings consistent this opinion.

## I. Background Facts and Proceedings.

Jerel Howard Green (Green) was injured in a single-vehicle accident in Council Bluffs on June 14, 2002. Green was transported to a hospital in Omaha, Nebraska, for treatment of his injuries. The circumstances surrounding the accident led sheriff's deputies at the scene to suspect alcohol was involved. One of the deputies was ordered to go to Omaha to meet with the defendant and obtain a blood sample for alcohol content testing.

After arriving at the hospital, the deputy sought approval from Green's treating physician for the withdrawal of a sample. The physician refused to provide consent and opined that Green could and should be approached personally. The deputy then spoke with Green, concluded he was coherent, and read an implied consent advisory to him. Green then signed an implied consent form, which permitted the withdrawal of his blood for testing. After Green's consent was obtained, Kathleen Tinley (Tinley), a phlebotomist employed by the hospital, came and withdrew Green's blood sample. Green's sample revealed that his blood alcohol content was above the legal limit. He was later charged by trial information with operating a motor vehicle while intoxicated. *Id.* § 321J.2.

Green filed a motion to suppress the results of his blood test and the contents of his conversation with the deputy. He contended that his condition on June 14 rendered him incapable of consenting to the withdrawal and the deputy failed to properly invoke implied consent. *See id.* § 321J.7 (providing a limitation on the invocation of implied consent in situations in which the defendant is unconscious or oth-

erwise incapacitated). He also asserted that his statements to the deputy were involuntary and in violation of rights recognized by the United States Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He subsequently amended his motion to further detail his arguments for suppression. However, Green never asserted in either version of his motion that the blood withdrawal was impermissible because a phlebotomist had conducted it.

A suppression hearing was held on March 6, 2003. At the hearing, the deputy who had sought Green's blood sample testified to his actions on June 14 and his interaction with Green in seeking his consent for the blood withdrawal. Tinley also testified, briefly outlining her job duties and her actions in withdrawing Green's blood. Tinley stated that she had been employed by the hospital for three years, but no further testimony was elicited about her background or qualifications. She also explained that her involvement with Green conformed to the standard procedure followed in similar situations, namely that no blood was withdrawn without patient or doctor consent.

On March 18, the district court issued its ruling sustaining Green's motion to suppress. The district court concluded that Tinley, as a phlebotomist, was not "one of the individuals approved by the Code of Iowa to take a blood sample for the purpose of determining alcohol concentration." The district court based this conclusion on its analysis of Iowa Code section 321J.11, which provides, in part:

> Only a licensed physician, licensed physician assistant as defined in section 148C.1, medical technologist, or registered nurse, acting at the request of a peace officer, may withdraw a specimen of blood for the purpose of determining the alcohol concentration....

In analyzing the statute and reaching its conclusion, the district court observed:

> A phlebotomist is defined as one who collects blood samples and body fluids from patients ... for laboratory testing. A general medical knowledge is helpful but not required.
>
> . . .
>
> In this case, there is no question Ms. Tinley is not a licensed physician, licensed physician assistant, or a registered nurse. A medical technologist is defined as one who performs a full range of laboratory tests. They are also responsible for confirming the accuracy of test results and reporting lab findings to the pathologist and other doctors. One can become a phlebotomist with as little as three week[']s training. To become a medical technologist, a bachelor[']s degree is required.

A subsequent motion to reconsider filed by the State was denied. The State then sought discretionary review, which we granted. For the reasons set out below, we reverse the district court's order suppressing the results of Green's blood test and remand this case for further proceedings consistent with this opinion.

## II. Standard of Review and Preservation of Error.

Our review of the district court's interpretation of Iowa Code section 321J.11 is for correction of errors at law. *See* Iowa R.App. P. 6.4; *State v. Hornik,* 672 N.W.2d 836, 838 (Iowa 2003). While "the district court's findings of fact are binding on this court if supported by substantial evidence[,] ... we are not bound by the district court's conclusions of law." *Horsfield Constr., Inc. v. Dubuque County,* 653 N.W.2d 563, 568 (Iowa 2002) (citations omitted).

The record contains no indication that either party fully anticipated the issue re-

lated to Tinley's qualifications on which the district court sustained Green's suppression motion. Green never raised the issue in either version of his suppression motion. Perhaps not surprisingly, the State never presented evidence relevant to Tinley's qualifications beyond standard introductory material to be expected when a party is introducing a witness. However, Green eventually raised the issue of Tinley's qualifications at some point during the suppression hearing proceedings after he was informed, apparently for the first time, that Tinley was a phlebotomist.[1] The State did not present any further evidence in response to Green's objections at the suppression hearing, but later filed a motion to reconsider requesting the opportunity to introduce additional qualifications evidence. The State's motion was denied. This course of proceedings and rulings served to preserve error for our review.

### III. Phlebotomists as Medical Technologists.

■ The term "phlebotomy" is derived from two Greek words: "*phlebos,* meaning veins, and *tome,* meaning incision." Ruth E. McCall & Cathee M. Tankersley, *Phlebotomy Essentials* 4 (3d ed.2003). The practice of phlebotomy has existed in various forms for centuries, but has evolved and transformed over time in light of advances in medical science. *See id.* at 4–8. Phlebotomy is now generally defined as "Incision into or needle puncture of a vein for the purpose of drawing blood." *Stedman's Med. Dictionary* 1369 (27th ed.2000).

Much of the phlebotomy that occurs in a modern medical setting is performed by phlebotomists, "individual[s] trained and skilled in phlebotomy." *Id.* These individuals are typically "educated in formal programs and on the job training, and credentialed through national certification examinations." Am. Soc'y for Clinical Lab. Sci., *Phlebotomy,* Clinical Lab. Sci., Mar./Apr.1999, at 70. In fact, phlebotomists are now "recognized as key personnel who are well prepared to assume additional roles to meet healthcare needs." *Id.*

Iowa Code section 321J.11 permits "[o]nly a licensed physician, licensed physician assistant . . ., medical technologist, or registered nurse" to withdraw a blood sample for alcohol content testing. Clearly, phlebotomists are not specifically mentioned in the statute as individuals qualified to withdraw blood for testing. It is also undisputed that a phlebotomist is not a licensed physician, licensed physician assistant, or registered nurse as those terms are used in the statute. *See id.* Instead, the controversy in this case hinges on whether a phlebotomist—in this case, Tinley specifically—is a medical technologist for purposes of the withdrawal statute. *Id.*

The district court concluded that a phlebotomist is not a medical technologist based upon the court's observation that an individual can become a phlebotomist with only three weeks of training while a medical technologist must obtain a bachelor's degree. The district court reached this conclusion by applying several assump-

---

**1.** Green's failure to raise the issue of Tinley's qualifications to withdraw blood earlier in the proceedings may have been the result of misinformation provided by the State in notifying Green that Tinley would be called as a witness. In a Notice of Additional Witnesses filed with the district court and provided to Green, the State identified Tinley as a registered nurse. As a registered nurse, Tinley would have been included in the list of those persons permitted to withdraw blood pursuant to Iowa Code section 321J.11 (2003). Apparently, Green and the district court were first informed that Tinley was actually a phlebotomist through Tinley's own testimony at the suppression hearing.

tions and drawing a number of inferences from the statute's language. These assumptions and inferences appear to have been influenced by two of our prior cases in this area, *State v. Winquist*, 247 N.W.2d 256 (Iowa 1976) and *State v. Snyder*, 203 N.W.2d 280 (Iowa 1972).

The district court implicitly found Iowa Code section 321J.11 was designed by the legislature to convey a "ranking" of the education and licensure of the four groups listed. *See* Iowa Code § 321J.11; *see also Snyder*, 203 N.W.2d at 285. Thus, physicians lead the list because of the content and extent of their education and licensure, while registered nurses end the list because less education and less stringent licensure is required to become a registered nurse. The district court also apparently considered that some or all registered nurses have achieved their designation by completing less than a bachelor's degree level of education as compared to physicians, who ultimately achieve a graduate medical degree. *See Snyder*, 203 N.W.2d at 285. The district court then interpreted the medical technologist language by applying these assumptions and concluding a medical technologist's training and licensure must be more than that of the average registered nurse while less than that of a physician. This led the district court to conclude that a medical technologist must have a bachelor's degree to be a medical technologist. Therefore, because a person can apparently become a phlebotomist without a bachelor's degree, phlebotomists as a group cannot be medical technologists.

While the district court's conclusion on this issue has some logical basis, we believe our prior precedents and the record in this case actually repudiate both its underlying assumptions and ultimate conclusion. Key to the district court's ulti-

mate conclusion that a phlebotomist is not a medical technologist was its underlying conclusion that the legislature's placement of medical technologists in the statute was purposeful and meant to define a medical technologist by the education or licensure one has obtained. However, we have previously considered the term medical technologist, and stated that education or licensure alone does not define this class of individuals:

> Unlike the situation of physicians and registered nurses, the Code does not provide for state licensing of medical technologists. Nor do statutory educational or training standards exist. The test to determine whether a person holding himself out as a medical technologist is a medical technologist within the meaning of [Iowa Code section 321J.11] is whether a satisfactory showing can be made that he has sufficient training in the withdrawal of blood to accomplish the legislative objectives of protecting the individual's health, guarding against infection and pain, and assuring the accuracy of the test, all in accordance with accepted medical standards. The concern is with the competence of the person withdrawing the blood rather than with an occupational label he may have been awarded by a private association.

*Winquist*, 247 N.W.2d at 259 (citations omitted); *accord Snyder*, 203 N.W.2d at 284–85; *see also IBP, Inc. v. Harker*, 633 N.W.2d 322, 325 (Iowa 2001) (" 'When interpreting a statute, our ultimate goal is to ascertain and give effect to the intention of the legislature.' " (Citation omitted.)). We believe this approach continues to properly define a medical technologist for purposes of the blood withdrawal statute, particularly in light of the fact the legislature has had nearly thirty years to alter or rewrite our interpretation of its language and has failed to do so.[2] *See Drahaus v. State*, 584

---

**2.** We recognize that the term "medical tech-     nologist" may have a more particularized

N.W.2d 270, 276 (Iowa 1998). Thus, the determination of whether an individual is a medical technologist as that term is used in Iowa Code section 321J.11 remains a broader inquiry that is not based on an individual's education or licensure alone.[3]

The district court determined a phlebotomist is not a medical technologist based on its assumption that phlebotomists as a class simply do not have a sufficient education to be technologists. Clearly, this conclusion and its limited basis are insufficient to properly determine whether a person is a medical technologist.[4] Moreover, the conclusions reached by the district court lack any basis in the record. Neither party presented evidence on the ques-

tion of a phlebotomist's education, licensure, training, or overall qualifications. In fact, no evidence was presented on Tinley's competence in particular, which is the critical inquiry that must be made in this case.[5] See Winquist, 247 N.W.2d at 259.

In the absence of record evidence with which we can consider Tinley's qualifications, we have no choice but to reverse the district court's order suppressing the results of Green's blood test and remand this case for further proceedings consistent with this opinion. Ultimately, we find that phlebotomists as a group may fall within the term "medical technologist" as it is used in Iowa Code section 321J.11. Further evidence must be taken to determine

meaning for a medical professional fully versed in medical terminology. *See, e.g., Procedures in Phlebotomy* 7–8 (John C. Flynn, Jr., ed.1994) (recognizing phlebotomists as part of "the field of medical technology," but providing an organizational chart of the structure of a clinical laboratory which separates "medical technologists" from "phlebotomists"). However, we believe the broader, non-particularized description of the term that we have previously adopted better aligns with the legislature's intent in listing those individuals qualified to withdraw blood pursuant to Iowa Code section 321J.11. *See State v. Winquist,* 247 N.W.2d 256, 259 (Iowa 1976).

3. This is not to say education or licensure has no role in the analysis of whether an individual is a medical technologist. Depending on the facts of the specific case, education or licensure may be the best evidence that the individual "has sufficient training in the withdrawal of blood to accomplish the legislative objectives of protecting the individual's health, guarding against infection and pain, and assuring the accuracy of the test, all in accordance with accepted medical standards." *Winquist,* 247 N.W.2d at 259.

4. Even assuming that the district court was correct with its apparent judicial notice that a person can become a phlebotomist with only three weeks training, there is no reason to presume the length of the training necessarily represents the content and quality of the

training. Indeed, three weeks of training may be more than sufficient to fully prepare one to properly withdraw blood in accordance with the legislature's objectives. *Winquist,* 247 N.W.2d at 259. Of course, there is no evidence in the record establishing the length, content, or quality of the training of any phlebotomist, much less Tinley in particular.

5. Importantly, other authority exists which casts doubt on many of the district court's conclusions related to phlebotomists generally and Tinley in particular. *See Stedman's Med. Dictionary* 1369 (27th ed. 2000) (A phlebotomist is "[a]n individual trained and skilled in phlebotomy," the "[i]ncision into or needle puncture of a vein for the purpose of drawing blood."); Am. Soc'y for Clinical Lab. Sci., *Phlebotomy,* Clinical Lab. Sci., Mar./Apr.1999, at 70; Lynn B. Hoeltke, *The Complete Textbook of Phlebotomy* 4–6 (2d ed.2000); *Procedures in Phlebotomy* at 6 ("[T]he underlying goal of all [certification] programs is the same: to assure employers that the phlebotomists they are hiring meet a minimally acceptable standard of practice."); *see also State ex rel. Pennartz v. Olcavage,* 200 Ariz. 582, 30 P.3d 649, 655 (Ct.App.2001); *Thurman v. State,* 172 Ga.App. 16, 321 S.E.2d 780, 781–82 (1984); *Speers v. Commonwealth,* 828 S.W.2d 638, 639–40 (Ky.1992); *Olson v. Comm'r of Public Safety,* 513 N.W.2d 491, 493 (Minn.App.1994); *Nesbitt v. Director of Revenue,* 982 S.W.2d 783, 786 (Mo.Ct.App.1998); *State v. Bingham,* 921 S.W.2d 494, 495–96 (Tex.Ct.App.1996).

whether the phlebotomist in this case—Tinley—is indeed a medical technologist as that term is used in the statute.

## IV. Propriety of Implied Consent Procedures.

 Green has also renewed on appeal his claim that the deputy improperly invoked implied consent when he came to visit Green at the hospital and received Green's waiver to have his blood withdrawn. Of course, the district court never ruled on this issue, choosing instead to sustain the motion based solely on its phlebotomy analysis. We have previously deemed the absence of a decision by a district court on an alternative ground asserted but not ruled upon by the court—here, another possible ground for suppression—as precluding our review of that ground on appeal. *See Junkins v. Branstad,* 421 N.W.2d 130, 135–36 (Iowa 1988); *Iowa–Illinois Gas & Elec. Co. v. Iowa State Commerce Comm'n,* 347 N.W.2d 423, 427 (Iowa 1984). We believe this approach is warranted in this case as well and remand this issue for further consideration by the district court.

## V. Conclusion.

For each of the foregoing reasons, we reverse the district court's order suppressing the results of Green's blood test and remand this case for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**