# IN THE SUPREME COURT OF IOWA

No. 07–1679

Filed November 20, 2009

**MIRSAD BEGANOVIC** and **MINKA BEGANOVIC,**

Appellees,

vs.

**JOSHUA MUXFELDT** and **LONNIE G. MUXFELDT,**

Appellants.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Artis I. Reis, Judge.

Defendants in a personal injury action appeal from a decision by the district court imposing liability on an owner of a motor vehicle under the owner responsibility law. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Matthew J. Haindfield of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellants.

Richard O. McConville of Coppola, McConville, Coppola, Hockenberg & Scalise, P.C., West Des Moines, for appellees.

**CADY, Justice.**

In this case, we must decide if a person named as a co-owner on a certificate of title to a motor vehicle after purchasing the vehicle with another person solely to assist the cobuyer in obtaining financing for the purchase is exempt from the imposition of consent-owner liability under Iowa's owner responsibility law. The district court determined the person was liable as a matter of law, and the court of appeals affirmed. On further review, we affirm the decisions of the district court and the court of appeals.

## I. Background Facts and Proceedings.

Lonnie Muxfeldt is a certified public accountant. He owns and operates an accounting firm in Harlan called Muxfeldt Associates CPA, P.C. Lonnie and the corporation were co-owners of a 2001 Dodge Dakota pickup. The pickup was purchased in 2001 for approximately $25,000 and was completely depreciated for tax purposes in the year of the purchase.

In 2004, Lonnie decided to purchase a 2004 Dodge Durango from Harlan Auto Mart. In doing so, he wanted to structure the transaction in a way to minimize the income-tax consequences of the purchase to himself and his corporation and allow his son, Joshua, to purchase the 2001 Dakota with minimal sales tax consequences. Lonnie, however, knew this goal could not be accomplished if he sold the 2001 Dakota to Joshua and purchased the 2004 Durango from Harlan Auto Mart. Instead, Lonnie believed his goal could best be achieved if he first purchased the 2004 Durango from Harlan Auto Mart by trading in the 2001 Dakota, and if Joshua then purchased the 2001 Dakota from Harlan Auto Mart. Lonnie set out to accomplish his plan through a prearranged transaction that occurred on October 1, 2004.

On that date, Lonnie purchased the 2004 Durango from Harlan Auto Mart for an agreed price of $36,325. He paid for the vehicle by making a down payment, trading in the 2001 Dakota, and financing the balance.

Lonnie assigned the certificate of title to the 2001 Dakota to Harlan Auto Mart. Even though the 2001 Dakota had a market value of approximately $20,000, Lonnie agreed to a trade-in allowance of $9487.[1] Lonnie and Harlan Auto Mart apparently agreed to pass the undeclared equity in the 2001 Dakota to Joshua by reducing the price Harlan Auto Mart would sell the 2001 Dakota to Joshua to $9180. This plan allowed Joshua to pay state sales tax on the purchase price instead of the true market value, and resulted in a savings to Joshua of approximately $500.

The tax advantages to Lonnie and his corporation under the transaction were largely in the form of a reduction in income tax for the 2004 tax year based on the application of various provisions of the tax code and regulations. The tax savings were basically realized in two ways.

First, Lonnie understood he would be permitted under the Internal Revenue Code and associated Treasury regulations to treat the purchase of the 2004 Durango as a like-kind exchange of a business asset by trading in the 2001 Dakota. As a like-kind exchange, Lonnie and his corporation could avoid recapturing depreciation they had previously declared for tax purposes on the 2001 Dakota. If Lonnie had sold the 2001 Dakota directly to Joshua, the purchase of the 2004 Durango from Harlan Auto Mart would not have qualified as a like-kind exchange, and Lonnie would have been required to recapture that portion of the depreciation he took in 2001 on his 2004 tax return in an amount equal to the value of the 2001 Dakota at the time of the sale. The sale would have resulted in a taxable gain of approximately $20,000 (because Lonnie had fully depreciated the 2001 Dakota), and the gain would have increased the amount of taxable income for the tax year by

---

[1]The net trade-in allowance was actually $307 because the payoff amount of the existing financing on the 2001 Dakota was $9180. Thus, the amount financed by Lonnie and his corporation to purchase the 2004 Durango was $31,859.

$20,000. Under applicable tax rates, Lonnie and his corporation would have been required to pay state and federal taxes on the gain of approximately $8000. Thus, Lonnie and his corporation avoided paying this tax by selling the 2001 Dakota to Harlan Auto Mart.

Second, the transaction would allow Lonnie and his corporation to establish a new tax basis in the 2004 Durango based on the depreciated 2001 Dakota (zero) plus the amount of the cash paid (and amount financed) to purchase the Durango, commonly called "cash boot." Based on this new basis, Lonnie and his corporation were permitted to fully depreciate the Durango for tax purposes in an amount equal to the new basis in the year of purchase. Under the applicable tax rates, Lonnie calculated the depreciation deduction would decrease his tax liability on his 2004 tax return by approximately $12,000.[2] Therefore, the total savings to Lonnie and his corporation under the transaction was estimated to be $20,000.

The transaction took place as planned, with one wrinkle. Joshua intended to purchase the 2001 Dakota from Harlan Auto Mart by trading in his 2000 Dodge Intrepid and financing the balance of the purchase price. The trade-in allowance for the Intrepid was $9180. Joshua, however, still owed $9969 on existing financing for the Intrepid. Thus, the net trade-in allowance was a negative $489, and the transaction required Joshua to obtain financing of $9694 to purchase the 2001 Dakota.

Lonnie wanted the most favorable financing terms available for Joshua to purchase the 2001 Dakota. Joshua, however, did not have an established

---

[2]Interestingly, Lonnie testified he estimated the new basis for the 2004 Durango was $30,000, based on the zero basis of the 2001 Dakota and a cash boot of $30,000. While the cash boot was actually over $36,000, according to the terms of the purchase agreement, Lonnie neglected to recapture the equity in the 2001 Dakota of more than $9000, which he passed on to Joshua in the form of a reduction in the purchase price. Thus, the depreciation allowance on the 2004 Durango should have been less than the amount calculated by Lonnie.

credit history to obtain the best financing terms on his own. Consequently, Lonnie and Joshua jointly applied for a loan with Chrysler Financial to finance the purchase. This arrangement permitted Lonnie to use his credit history to obtain financing for Joshua. Chrysler Financial agreed to finance the purchase, but only if both loan applicants were also cobuyers of the vehicle.

As a result, the transaction on October 1, 2004, concluded by Lonnie and Joshua jointly purchasing the 2001 Dakota from Harlan Auto Mart. Lonnie and Joshua were both named as cobuyers on the purchase agreement, and Harlan Auto Mart reassigned the certificate of title to Lonnie and Joshua. Lonnie and Joshua also applied for a new title and registration as co-owners of the vehicle. The county treasurer issued a new certificate of title on October 15, 2004. The title named Joshua and Lonnie as co-owners of the 2001 Dakota.

Joshua took possession of the 2001 Dakota following the sale. He acquired automobile insurance for the vehicle and began making monthly payments on the loan. He was the exclusive operator of the vehicle. Lonnie exercised no control over the vehicle.

On December 25, 2004, Joshua was involved in an accident while driving the 2001 Dakota. His vehicle collided with a vehicle driven by Mirsad Beganovic. Mirsad's wife, Minka, was a passenger. The accident resulted in serious personal injuries, and the Beganovics brought a negligence lawsuit against Joshua and Lonnie. Lonnie was sued as a consenting co-owner of the 2001 Dakota driven by Joshua.

The case was tried to a jury in August 2007. Joshua admitted liability for injuries suffered by the Beganovics. Lonnie claimed, as an affirmative defense, he could not be liable under the ownership liability statute because

he had made a bona fide transfer of ownership of the vehicle to Joshua under the October 1, 2004 transaction.

The Beganovics filed a motion in limine prior to trial to exclude evidence of the October 1 transaction. They believed such evidence was irrelevant and Lonnie was a consent owner as a matter of law. The district court eventually permitted Lonnie to make an offer of proof outside the presence of the jury to support his claim that the October 1 transaction constituted a transfer of title to Joshua. The district court found the transaction did not constitute a transfer of his interest in the vehicle to Joshua and did not permit Lonnie to introduce evidence of the transaction to the jury. The district court ultimately directed a verdict at the close of the evidence at trial in favor of the Beganovics on Lonnie's affirmative defense that he transferred title to Joshua. The district court held as a matter of law that Lonnie did not transfer title in his interest in the vehicle to his son prior to the accident.

The jury returned a verdict of $952,000 in favor of the Beganovics against Joshua and Lonnie. Joshua and Lonnie appealed. They claim the district court misinterpreted Iowa's ownership liability statute and erred by failing to submit the bona fide transfer defense to the jury.

We transferred the case to the court of appeals. The court of appeals affirmed the judgment of the district court. Lonnie and Joshua sought, and we granted, further review.

### III. Standard of Review.

The issue to be decided is whether, under Iowa Code section 321.493(2) (2003),[3] the legislature intended for the transaction in this case to qualify as a bona fide transfer exemption. We review the application and

---

[3]All further references to the Iowa Code are to the 2003 Code unless otherwise indicated.

interpretation of statutes for errors at law. *State v. Green*, 680 N.W.2d 370, 372 (Iowa 2004). We are thus bound by the trial court's findings of fact if supported by substantial evidence, but are not bound by the court's determinations of law. *Id.*

**IV. Statutory Background of Consent-Owner Motor Vehicle Liability.**

The specific issue presented in this case broadly pertains to the liability of one person for the tort of another, or what is commonly called vicarious liability.[4] At common law, a person was, generally, only liable for the torts of another in a master-servant setting. *See Hartman v. Norman*, 253 Iowa 694, 701, 112 N.W.2d 374, 379 (1961). Over the years, however, various exceptions have been crafted to the common-law rule, including the motor vehicle consent statute, otherwise known as the owners' responsibility law. *See id.* at 701, 112 N.W.2d at 378–79.

This statute, originally enacted in 1919, imposes liability on the owner of a motor vehicle for damage done by reason of the negligent operation of the motor vehicle by the driver when driven with the consent of the owner. Iowa Code § 321.493(1). The legislature understood motor vehicles can be dangerous and, in the exercise of its police powers, wanted to hold owners responsible for damage caused by persons who drive a vehicle with the owner's consent. *Seleine v. Wisner*, 200 Iowa 1389, 1391–92, 206 N.W. 130,

---

[4]Vicarious liability is broadly defined as liability a person bears for the actionable conduct of another person because of a relationship between the two parties. *Black's Law Dictionary* 934 (8th ed. 2004). We recognize our owners' responsibility statute does not operate to impute the driver's liability to the owner, but imposes liability by imputing the driver's negligence to the owner. *Estate of Dean v. Air Exec, Inc.*, 534 N.W.2d 103, 104–06 (Iowa 1995). In other words, the liability imposed under the statute is the owner's own liability. *Id.* This liability versus negligence dichotomy has been important in helping us decide that a legal defense against liability possessed by the driver does not inure to the owner. *Id.*; *Smith v. CRST Int'l, Inc.*, 553 N.W.2d 890, 894 (Iowa 1996). Nevertheless, the owners' responsibility statute remains under the umbrella of vicarious liability by imposing liability on an owner for the actionable negligence of the driver.

131 (1925). Thus, the purpose of the law is to provide greater protection for an innocent third party from the careless operation of a motor vehicle by making the owner responsible for the negligence of a driver to whom the owner entrusted the vehicle. *Briner v. Hyslop*, 337 N.W.2d 858, 870 (Iowa 1983) (citing *Stuart v. Pilgrim*, 247 Iowa 709, 715, 74 N.W.2d 212, 216 (1956)). The rationale for imposing liability on a consent owner is consistent with the rationale for creating an exception to the common-law rule of vicarious liability for the master-servant relationship. The owner of a motor vehicle has the ability to control its use and to entrust the vehicle to competent drivers. *See Federated Mut. Implement & Hardware Ins. Co. v. Rouse*, 133 F. Supp. 226, 235 (N.D. Iowa 1955).

As with other legal principles, the principle of consent-owner liability has been shaped by events and discourse of time. This transformation was first observed in 1937 when the legislature amended the motor vehicle laws to exempt the owner of a motor vehicle from the owners' responsibility law when the owner "made a bona fide sale or transfer of his title or interest and . . . delivered possession of such vehicle to the purchaser or transferee . . . ." *See* 1937 Iowa Acts ch. 134, § 82 (codified as amended at Iowa Code § 321.493(2)). At the same time, the legislature amended the definition of an "owner" for purposes of the motor vehicle law to include the vendee or lessee under a conditional sales agreement or lease of a vehicle. *See id.* ch. 134, § 1(33).

The legislature made the changes to the owners' responsibility law in response to various legal proceedings brought by tort victims seeking to impose liability on a conditional vendor of a motor vehicle under the owners' responsibility law for the negligence of the conditional vendee-driver of the vehicle. *See Rouse*, 133 F. Supp. at 234–35. Consequently, we found the 1937 amendments were passed by the legislature as an expression of its

intent to exclude vendors under a conditional sales contract from liability under the owners' responsibility law. *Hansen v. Kuhn*, 226 Iowa 794, 803–04, 285 N.W. 249, 255 (1939). The reason for this exclusion was apparent. When an owner has departed with possession and control of a vehicle under a conditional contract for sale, the rationale for imposing vicarious liability on a consent owner dissipates. *See Rouse*, 133 F. Supp. at 235–36. It would be unfair to impose liability on an owner who holds title after the sale only to secure future payment of the amount of the purchase, not to exercise control over the use of the vehicle. *See id.*

Thus, the legislature began to shape the broad rule of consent-owner liability in two ways. First, it expanded the definition of an "owner" by including vendees and lessees under a conditional sales agreement. Second, it crafted an exemption from the substantive rule of owner liability for sellers in a bona fide sale or transfer. Both amendments reflected circumstances in which the imposition of liability on the actual owner did not conform with the purpose of the owners' responsibility statute.

The next event that shaped the owners' responsibility law came in 1953 when the legislature enacted the Iowa Motor Vehicle Certificate of Title Act. 1953 Iowa Acts ch. 127 (codified as amended at Iowa Code §§ 321.17–.44A). This legislation was part of a national movement for laws governing certificate of title to motor vehicles. *See Rouse*, 133 F. Supp. at 230. Among other provisions, the Act provided that a person could not acquire a right, title, or interest in any vehicle (subject to registration) from the owner except by a certificate of title. *See* Iowa Code § 321.45(2) (1954); *see also Schultz v. Sec. Nat'l Bank*, 583 N.W.2d 886, 889 (1998). However, the new provision made no reference to the existing owner responsibility law. Thus, a question arose whether the existing bona fide sale or transfer exception to the owners'

responsibility law required an assignment of title. *See Hartman*, 253 Iowa at 703–04, 112 N.W.2d at 380.

The legislature ultimately answered the question in 1955 through additional amendments. It combined the owner consent statute and the bona fide sale or transfer exemption into the same statute, declared a purchaser or transferee of a bona fide sale or transfer to be an "owner" under the statute, and expressly stated that the certificate-of-title requirement did not apply in determining whether a person had made a bona fide sale or transfer under the consent-owners' liability statute. 1955 Iowa Acts ch. 157, § 8 (codified as amended at Iowa Code § 321.493(2)). We subsequently concluded the legislature intended to express the notion that a bona fide sale or transfer, with delivery of possession of the vehicle, relieved the vendor of liability for damages resulting from the negligent operation of the vehicle even when the vendor failed to transfer the certificate of title. *Hartman*, 253 Iowa at 703–04, 112 N.W.2d at 380. We said:

> The question under this statute is not who may own the vehicle or have a lien according to the county records. It is not who may owe for the purchase price or how the indebtedness is evidenced. If there was a bona fide sale and delivery of possession, the statute relieves the seller from liability for subsequent negligence of the operator.

*Id.* at 704, 112 N.W.2d at 380.

The next significant event affecting the owners' responsibility law occurred in 1965 when the legislature, as part of its adoption of the Uniform Commercial Code, amended the definition of an "owner" in the definition section of the motor vehicle chapter. While maintaining the primary definition of an owner as "a person who holds legal title," the legislature removed the alternate definition of an owner pertaining to vendees, lessees, or mortgagors. 1965 Iowa Acts ch. 413, § 10112 (codified as amended at Iowa Code § 321.1(49)). In its place, the legislature declared a debtor to be

an owner when "a motor vehicle is the subject of a security agreement with a right of possession [vested] in the debtor." *Id.*

The final substantive amendment to the statute occurred in 1995. At this time, the legislature defined an "owner" for the purposes of imposing civil liability under the owners' responsibility law as a "person to whom the certificate of title for the vehicle has been issued or assigned or to whom a manufacturer's or importer's certificate of origin for the vehicle has been delivered or assigned." 1995 Iowa Acts ch. 136, § 1 (codified as amended at Iowa Code § 321.493(1)). Yet, the legislature specifically excluded a lessor of a motor vehicle from the meaning of an "owner" for the purposes of determining civil liability. *Id.* It also provided a definition of a "leased" vehicle. *Id.* This amendment followed on the heels of our decision that a leasing company remained the owner of a motor vehicle because the lease of a motor vehicle did not constitute either a security agreement or a bona fide sale or transfer. *Peterson v. Ford Motor Credit Co.,* 448 N.W.2d 316, 319–20 (Iowa 1989).

Accordingly, the legislative history of the owners' responsibility law reveals our legislature has modified the breadth of consent-owner liability over the years in two ways. First, consent-owner liability under the owners' responsibility law has been circumscribed by changes made to the definition of an owner. The legislature has not only defined an owner as a person to whom the certificate of title to the vehicle has been issued or assigned, but also included three additional categories of persons to whom the certificate of title has not been issued or assigned. These categories are: (1) the lessee under a written lease for a period of twelve months or more with a lessor to whom the certificate of title has been issued, (2) a debtor in possession of a vehicle pursuant to a security agreement, and (3) a purchaser or a transferee

of a vehicle who has received delivery of the vehicle under a bona fide sale or transfer. Iowa Code §§ 321.493(1)(*a*), 321.1(49), 321.493(2).

Second, the corresponding titleholder in each additional category of those persons defined as an owner has either been excepted by the legislature from the definition of an "owner" or exempted from liability. Thus, a lessor who holds title is excluded from the definition of an owner, while the lessee is included in the definition. *Id.* § 321.493(1)(*a*). A title-holding creditor of a debtor in possession of a vehicle under a security agreement is excluded from the definition of an owner, while the debtor is included in the definition. *Id.* Finally, no liability is imposed on a person who has made a bona fide sale or transfer of a motor vehicle and delivered possession to the purchaser or transferee, but who remains the record titleholder. *Id.* § 321.493(2). Accordingly, the legislature excepts or exempts three categories of titleholders who have a legal relationship with the possessor of the vehicle and substitutes the possessor of the vehicle for each titleholder as the owner subject to the owners' responsibility law. As a result, to avoid consent-owner liability in Iowa, a person to whom title has been assigned or transferred must either fall within the statutory exclusion of an "owner" or be exempt under the statute from liability.

**V. Application of Statute.**

In this case, Lonnie acknowledges he falls within the definition of an "owner" under the owner responsibility law as a person to whom certificate of title has been issued or assigned. This acknowledgement creates a prima facie case of ownership, which may be overcome by evidence that the titleholder is exempt from liability under the statute or is not an owner under the statute. *See W. States Ins. Co. v. Cont'l Ins. Co.*, 602 N.W.2d 360, 362 (Iowa 1999) (citing *State Farm Mut. Auto. Ins. Co. v. Wyant*, 191 N.W.2d 689, 692 (Iowa 1971)) (recognizing title owner has a defense under the

statute to ownership); *Six v. Freshour*, 231 N.W.2d 588, 591 (Iowa 1975) (recognizing prima facie case of ownership by a certificate of title).

Lonnie does not argue he is excluded as an "owner" under the statute as a lessor. He does not claim to be a creditor holding title under a security agreement. Instead, he asserts he is exempt from liability under the owners' responsibility statute as a person who made a bona fide sale or transfer of a motor vehicle and delivered possession of the vehicle. Thus, we must decide if the district court properly determined the offer of proof made by Lonnie at trial was insufficient to submit his bona fide sale or transfer defense to the jury. This ultimately narrows the issue to whether or not the legislature intended for the transaction described in this case to fall within the bona-fide-transfer exemption under the statute.

Our preceding discussion of the early background and history of the owners' responsibility law reveals the bona-fide-sale-or-transfer exemption surfaced in the statute to shield from liability title owners who sold a motor vehicle but retained title under a conditional sales contract. *See Rouse*, 133 F. Supp. at 234–35. Yet, we subsequently determined our legislature intended for the exemption to apply more broadly to include persons who sell or transfer a motor vehicle to another person, but remain the owner on the certificate of title after the sale or transfer due to a defect in the transfer of title or some other failure to complete the transfer of title. *See Peterson*, 448 N.W.2d at 320. Thus, we found the bona-fide-sale-or-transfer exemption exists in the statute "to avoid the imposition of liability upon the prior owner merely for failing to effect a transfer of the title certificate to the new owner." *Id.*; *see also Hartman*, 253 Iowa at 704, 112 N.W.2d at 380 (stating the statute may be applicable regardless of name on certificate of title). As a result, courts applying the bona-fide-sale-or-transfer exemption evaluate the facts to determine the existence of a bona fide sale or transfer between a

seller or transferor and a buyer or transferee that gives the buyer (transferee) enforceable rights against the seller (transferor) and possession of the vehicle. *Weber v. Warnke,* 658 N.W.2d 90, 94–95 (Iowa 2003) (citing *Desy v. Rhue,* 462 N.W.2d 742, 745 (Iowa App. 1990)). The focus of the exemption is to exclude the seller or transferor from liability based on the bona fide sale or transfer and to deem the purchaser or transferee of the bona fide sale or transfer to be the owner for the purposes of civil liability.

We have applied the bona-fide-sale-or-transfer exemption from civil liability following the passage of the Registration of Title Act on several occasions. In *Hartman,* we held the sale of a motor vehicle by means of a down payment followed by installment payments constituted a bona fide sale upon delivery of the vehicle to the buyer, even though the title had not been transferred. 253 Iowa at 699, 704, 112 N.W.2d at 377, 380. In *State Automobile & Casualty Underwriters v. Farm Bureau Mutual Insurance Co.,* 257 Iowa 56, 59, 131 N.W.2d 265, 266–67 (1964), we held the transfer of a motor vehicle on the condition that the transferee would assume transferor's remaining payments on a loan secured by the vehicle constituted a bona fide transfer, even though the transferor retained title to accommodate the refusal by the mortgagee to transfer the loan obligation from the transferor to the transferee. In *Six,* we held that a transfer of a motor vehicle from a father, who continued to hold title, to his son, who made the contract payments on the car and exclusively possessed the car, generated a jury question on the existence of a bona fide sale or transfer. *Six,* 231 N.W.2d at 590–91. These three cases not only illustrate the type of transaction that may lead a seller or transferor to retain title following a bona fide sale or transfer, but also recognize that each transaction has been predicated on a threshold sale or transfer of the vehicle from the seller or the transferor to the buyer or the transferee.

In contrast, we have refused to recognize a bona fide transfer without a sale or transfer between the parties. In *Peterson*, we held a lessee under a lease of a motor vehicle with an option to purchase could not establish a bona fide sale or transfer with the car dealer who transferred title to the lessor. 448 N.W.2d at 319–20. We determined, as a matter of law, that the three-party transaction was neither a sale nor a transfer of the dealer's rights, title, or interest in the vehicle to the lessee. *Id.* at 320. Thus, we have refused to expand the bona-fide-sale-or-transfer exemption beyond the transactional circumstances identified by the specific language of the statute.

Lonnie maintains his name emerged from the transaction in this case as an owner on the certificate of title only as an accommodation to his son, not to maintain any control or dominion over the vehicle. Consequently, Lonnie asserts the reason he is a titleholder is compatible with the same circumstances that supported exempting the titleholders from liability in *State Automobile* and *Six*. Lonnie argues he was at least entitled to have the jury decide if he was exempt from liability under the owners' responsibility law. He contends that denial of a jury trial on the issue of ownership effectively imposed a standard for liability based on "title principles," in direct contravention of the standard of liability under the statute based on "ownership principles." Lonnie asserts that denial of a jury trial resurrects the long dispelled notion that a bona fide sale or transfer requires the transfer of a certificate of title.

We agree the owners' responsibility law recognizes a distinction between "title principles" and "ownership principles" in determining liability under the bona-fide-sale-or-transfer exemption. The statute, however, utilizes both principles by first imposing liability based on "title principles" and then exempting titleholders who make a bona fide sale or transfer from

liability by applying "ownership principles." Thus, "title principles" apply to impose liability unless the titleholder has made a bona fide sale or transfer and delivery of possession. Yet, if a titleholder has failed to make a bona fide sale or transfer, liability is imposed based on title, and "ownership principles" do not apply.

Normally, a jury must decide the question whether a bona fide sale or transfer has occurred. *See Six*, 231 N.W.2d at 591. The question is properly submitted to the jury under the statute only when the transaction involves a titleholder who claims to have sold or transferred ownership to another person without transferring title. As a matter of law, Lonnie was not a seller or transferor who failed to convey title. He transferred the vehicle to the dealership, and title to the vehicle was assigned to the dealership. Lonnie specifically structured the transaction in this manner to create a like-kind exchange of business property so he could accomplish his desired tax savings. He was subsequently named as a co-owner on a new certificate of title to accomplish his goal of obtaining favorable financing. No facts were presented to support a finding that he was a bona fide seller who failed to transfer title.

We acknowledge the rationale for exempting from liability sellers and transferors of a bona fide sale or transfer of vehicle who remain titleholders is compatible with exempting persons like Lonnie who became a titleholder simply to assist or enable another person to obtain financing to purchase a vehicle. The offer of proof by Lonnie revealed he was, as a copurchaser, as detached from the concept of ownership as a bona fide seller or transferor who delivered possession but failed to deliver title.

Nevertheless, courts interpret a statute to discern its intended scope by relying on the language of the statute. *Iowa Beta Chapter of Phi Delta Theta Fraternity v. State*, 763 N.W.2d 250, 260 (Iowa 2009) (citing *State v.*

*Wiederien*, 709 N.W.2d 538, 541 (Iowa 2006)). The language of the owners' responsibility law does not speak to an exemption for persons who become titleholders of a vehicle merely to accommodate financing for a cobuyer. The bona-fide-sale-or-transfer provision applies only to transactions between sellers or transferors and purchasers or transferees. Only in this context does the statute exempt a seller or transferor from liability and deem the purchaser or transferee to be the owner for purposes of liability. It is the role of the legislature, not the courts, to decide if co-owners like Lonnie should also be exempt from liability. *See State v. Olsen,* 618 N.W.2d 346, 351 (Iowa 2000) (stating " '[o]nce the legislature has spoken, [our] role is to give effect to the law as written,' not to rewrite it to reflect a policy different from that language" (quoting *State v. Wagner,* 596 N.W.2d 83, 88 (Iowa 1999))); *see also Kruse v. Iowa Dist. Ct.,* 712 N.W.2d 695, 699–700 (Iowa 2006) (recognizing courts do not speculate as to legislative intent apart from the words used in a statute).

**VI. Conclusion.**

We have considered all claims raised by Lonnie and Joshua. We affirm the judgment of the district court and the decision of the court of appeals.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**